735 So.2d 1172 (1999)
Ex parte Fred MELOF et al.
(In re Fred Melof, et al. v. Fob James, et al.).
1971900.
Supreme Court of Alabama.
May 28, 1999.
*1173 Charles A. Dauphin and Elizabeth L. Wood of Baxley, Dillard, Dauphin & McKnight, Birmingham, for petitioners.
Ron Bowdon, counsel, Department of Revenue, and asst. atty. gen.; and Mark Griffin, asst. counsel, Department of Revenue, and asst. atty. gen., for respondent Commissioner of Revenue for the State of Alabama.
HOUSTON, Justice.
This case presents the question whether Alabama's retirement-benefit taxation classifications conflict with Amendment 25 to the Alabama Constitution of 1901 and equal-protection guarantees of the United States and Alabama Constitutions.
On April 14, 1989, this class action was filed in the Montgomery County Circuit Court against the Governor and the State commissioner of revenue in their official capacities (hereinafter collectively referred to as "the State"), on behalf of four subclasses of persons who had paid Alabama state income tax on retirement benefits received through the retirement programs of their employers: the Federal Government (including the military services); certain Alabama political subdivisions; and private employers. The complaint alleged that Alabama's system of exempting certain state retirees from income tax on retirement benefits while taxing the retirement benefits of private retirees and some public retirees (hereinafter that system is called the "retirement-tax structure") violated the Equal Protection Clause of the Fourteenth Amendment as well as an *1174 equal-protection guarantee of the Alabama Constitution provided under the combination of §§ 1, 6, and 22.
The case was filed pursuant to the United States Supreme Court's decision in Davis v. Michigan Dep't of Treasury, 489 U.S. 803, 109 S.Ct. 1500, 103 L.Ed.2d 891 (1989), holding that Michigan's practice of applying different income-tax structures on federal and state retirement income was invalid under 4 U.S.C. § 111 and under the intergovernmental-tax-immunity doctrine.
The circuit court consolidated this case with two other cases that had been filed against the State: Rinehart v. Sizemore, CV-89-704, and Olts v. Sizemore, CV-89-734. Those two cases involved the taxation of retirement benefits of federal and military retirees. The parties involved in all three cases agreed to: 1) ratify Rinehart as establishing the appropriate class to represent the federal and military retirees, 2) dismiss the Olts case, and 3) sever the claims of the private retirees from those of the federal and military retirees. A judgment was eventually entered for the federal and military retirees in Sizemore v. Rinehart, 611 So.2d 1064 (Ala.Civ.App. 1992), writ quashed, 611 So.2d 1069 (Ala. 1993).
The four subclasses of retirees (with their representatives) are as follows:
"(1) Fred Melof; Melof receives a pension pursuant to a `defined benefit plan' as a former employee of United States Steel Corporation. Since tax year 1991, Melof's retirement benefits have been exempt from income tax. Melof represents taxpayers who have paid income tax on private retirement benefits for the years 1985 to 1990.
"(2) E.K. Alley; Alley, a retired police officer, received a pension and annuity from the City of Birmingham and the Alabama Peace Officers Annuity and Benefit Fund. Alley paid income tax for the years 1985 through 1990 on his retirement benefits in excess of $8,000.00 per year. Alley represents two subclasses: (a) eligible peace officers and fire fighters who paid income tax on retirement benefits in excess of $8,000.00 per year for the years 1985 through 1990; and (b) taxpayers who have paid income tax on retirement benefits from a municipal, county or public board which has not or had not joined the State Employees Retirement System of Alabama for the years 1985 through the present.
"(3) Marilyn Mooring; Mooring, a retired private school teacher, receives a pension pursuant to a `defined contribution plan' offered by her former employer. Mooring represents taxpayers who have paid income tax on retirement benefits received from a `defined contribution plan,' or other private or public allowances, pensions or annuities for the years 1985 through the present."
Melof v. James, 735 So.2d 1166 (Ala.Civ. App.1998).
The representatives of the four subclasses described above ("representatives") filed an amended complaint that restated the allegations of equal-protection violations, but added the further allegation that Alabama's retirement-tax structure violated the provisions of Amendment 25 of the Alabama Constitution, which requires that "[i]n the event the legislature levies an income tax, such tax must be levied upon the salaries, income, fees, or other compensation of state, county and municipal officers and employees, on the same basis as such income taxes are levied upon other persons." The representatives sought a refund of all taxes determined by the court to have been collected from class members in violation of constitutional principles within the statutory three-year period of limitations.
The representatives and the State moved for summary judgments. The trial court entered a summary judgment for the State, holding that, "for Alabama tax purposes, Alabama's pre-1991 and post-1991 classification of retirement benefits is not *1175 in violation of the provisions of Amendment 25 to the Alabama Constitution, the Equal Protection Clause or the equal protection provisions of the Alabama Constitution," and it thus denied the representatives' requests for refund of taxes paid on their retirement benefits. The Court of Civil Appeals affirmed. Melof v. James, 735 So.2d 1166. We granted the representatives' petition for certiorari review and heard oral arguments. We now affirm.

Issue I

Whether Alabama's retirement-tax structure violates Amendment 25 to the Alabama Constitution of 1901.
The exemptions and constitutional amendments at issue were adequately recounted in their historical context by the Court of Civil Appeals:
"Amendment 25 to the Alabama Constitution of 1901 was ratified in 1933. It authorized the State to levy an income tax on Alabama citizens, but prohibited any special income tax treatment of the income of public officers and employees. Subsequent to the ratification of Amendment 25, the Legislature enacted an Alabama income tax in 1935. 1935 Ala. Acts No. 194.
"The Legislature created the Teachers Retirement System of Alabama (`TRS') and the State Employees Retirement System of Alabama (`ERS') in 1939 and 1945, respectively. 1939 Ala. Acts, Act No. 419, and 1945 Ala. Acts, Act No. 515. Each of the acts creating the two retirement systems contains a provision exempting the systems' retirement benefits from any state or municipal tax. These exemptions remain in effect today. § 16-25-23 and § 36-27-28, Ala. Code 1975.
"Amendment 61 to the Alabama Constitution of 1901 was ratified in 1947. Section C. of that Amendment provides:
"`All laws relating to the income tax, not in conflict herewith and valid on the date of the ratification of this amendment, are hereby validated and confirmed.'
"In 1958, the Legislature codified the previously granted exemptions to retirement benefits of TRS and ERS members into the income tax statutes. 1959 Ala. Acts, Act No. 112.
"Pursuant to § 36-27-6(a), Ala.Code 1975, counties, municipalities, and public or quasi-public boards of the state may join the ERS and thereby qualify their retirees for the exemption of retirement benefits from Alabama income tax.
"Beginning with the tax year 1991, the Legislature exempted from income tax the retirement benefits received by Alabama taxpayers from: 1) the TRS, 2) the ERS, 3) political subdivisions of the State for employment as firefighters or peace officers, 4) any United States Government source; and 5) a "defined benefit plan," as defined in § 414(j) of the Internal Revenue Code of 1986. §§ 40-18-19 through -20, Ala.Code 1975.
"Before 1991, for the tax years beginning in 1987, firefighters received an exemption on the first $8,000 per year of retirement compensation. Before 1991, for the tax years beginning in 1984, peace officers received an exemption on the first $8,000 per year of retirement compensation. Before 1991, there was no exemption for private retirement benefits. The retirement benefits of Alabama teachers, state employees, and federal civil service employees were exempt from tax before 1991 and for the years in question in this case.
"The Internal Revenue Code, as amended by the Employee Retirement Income Security Act (`ERISA'), Pub.L. No. 93-406, 1974, classifies qualified retirement plans as `defined benefit plans' and `defined contribution plans.' The distinction between the two types of plans is that an employee's benefit under a `defined contribution plan' is the amount in an account in the employee's name, while an employee's benefit under a `defined benefit plan' is specified by *1176 the terms of the plan. In other words, a `defined contribution plan' specifies how much goes into the plan, while a `defined benefit plan' specifies how much comes out of the plan.
"The retirement benefits distributed by the TRS and the ERS are from a `defined benefit plan,' meaning that the employee's benefit is specified by the terms of the plan. § 16-25-14 and § 36-27-16, Ala.Code 1975."
Melof v. James, 735 So.2d at 1168-69.
In essence, Amendment 25 to the Alabama Constitution of 1901 does three things: 1) it allows the Legislature to institute an income tax; 2) it tells how the tax funds are to be distributed; and 3) it prohibits the State from imposing on the citizenry at large an income-tax structure that differs from that applied to state employees. Amendment 25 reads in full:
"Article XXII. The legislature shall have the power to levy and collect taxes for state purposes on net incomes from whatever source derived within this state, including the incomes derived from salaries, fees and compensation paid from the state, county, municipality, and any agency or creature thereof, for the calendar year, 1933, and thereafter and to designate and define the incomes to be taxed and to fix the rates of taxes, provided that the rate shall not exceed 5 percent nor 3 percent on corporations. Income shall not be deemed property for purposes of ad valorem taxes. From net income an exemption of not less than fifteen hundred dollars ($1,500.00) shall be allowed to unmarried persons and an exemption of not less than three thousand dollars ($3,000.00) shall be allowed to the head of a family, provided that only one exemption shall be allowed to husband and wife where they are living together and make separate returns for income tax. An exemption of not less than three hundred dollars ($300.00) shall be allowed for each dependent member of the family of an income tax payer under the age of 18 years. The legislature shall reduce the ad valorem tax from time to time when and to such an amount as the revenue derived from the income tax will justify. In the event the legislature levies an income tax, such tax must be levied upon the salaries, income, fees, or other compensation of state, county and municipal officers and employees, on the same basis as such income taxes are levied upon other persons. All income derived from such tax shall be held in trust for the payment of the floating debt of Alabama until all debts due on Oct. 1st, 1932, are paid and thereafter used exclusively for the reduction of state ad valorem taxes."
(Emphasis added.)
The representatives argue that the Legislature has, through the system of exemptions described above, levied an income tax on persons other than state, county, and municipal officers and employees (hereinafter referred to as "private employees") on a basis different from the basis upon which income received by state, county, and municipal officers and employees (hereinafter referred to as "public employees") is taxed. They claim that, according to the "plain meaning" of Amendment 25, any income tax levied on Alabama taxpayers must be levied "on the same basis" as that levied on income paid to "state, county and municipal" employees. They then conclude that for the income tax to be levied on the same basis, pension benefits, which are exempt from income tax when received by a public employee, must be exempt from income tax when received by a private employee.
The representatives claim that retirement benefits are "salaries, income, fees, or other compensation" within the meaning of Amendment 25. In this respect, the representatives argue that the fact that pension benefits are paid to former public officers and employees does not render the prohibitions of Amendment 25 inapplicable, because, they say, the words "other compensation" encompass pension benefits *1177 distributed to former employees. The representatives claim that these pension benefits are merely "deferred compensation," like those benefits addressed by the United States Supreme Court in Davis v. Michigan Dep't of Treasury, supra, 489 U.S. 803, 109 S.Ct. 1500, 103 L.Ed.2d 891.
Davis involved a former federal employee, Davis, who challenged Michigan's practice of exempting from taxation retirement benefits paid by the State of Michigan or its political subdivisions, while taxing retirement benefits paid by other employers. While Davis dealt with the interpretation of federal law, the Court resolved the issue whether pension benefits are "deferred compensation" and did so in a persuasive manner:
"[Davis] places principal reliance on 4 U.S.C. § 111. In relevant part, that section provides:
"`The United States consents to the taxation of pay or compensation for personal service as an officer or employee of the United States ... by a duly constituted taxing authority having jurisdiction, if the taxation does not discriminate against the officer or employee because of the source of the pay or compensation.'
"As a threshold matter, the State argues that § 111 applies only to current employees of the Federal Government, not to retirees such as appellant. In our view, however, the plain language of the statute dictates the opposite conclusion. Section 111 by its terms applies to `the taxation of pay or compensation for personal services as an officer or employee of the United States.' [Emphasis added in Davis.] While retirement pay is not actually disbursed during the time an individual is working for the Government, the amount of benefits to be received in retirement is based and computed upon the individual's salary and years of service. We have no difficulty concluding that civil service retirement benefits are deferred compensation for past years of service rendered to the Government. And because these benefits accrue to employees on account of their service to the Government, they fall squarely within the category of compensation for services rendered `as an officer or employee of the United States.' Appellant's federal retirement benefits are deferred compensation earned `as' a federal employee, and so are subject to § 111."
Davis, 489 U.S. at 808, 109 S.Ct. 1500 (citations omitted).
According to the representatives, then, because the statutes in question levy income tax on the "compensation" of public employees differently than they do on the "compensation" of private employees, the retirement-tax structure directly conflicts with Amendment 25 and is unconstitutional.
The Court of Civil Appeals disagreed with the representatives' arguments and adopted the trial court's conclusion that the Amendment 25 prohibition on special income-tax treatment was repealed by Amendment 61, which reads:
"Section A. The entire proceeds of the income tax in the treasury of the state of Alabama on September 30, 1947, including cash and investments and the interest thereon, shall be used for the following purposes and in the following manner: 1st. The sum of $12,249,860.00 shall be and is hereby set aside and shall be and is hereby constituted an irrevocable trust fund for the purpose of paying the principal of and interest on the bonds issued by the state of Alabama commonly known as `income tax bonds,' being the warrant refunding bonds issued to fund the floating debt existing October 1, 1932, which bonds were issued under the authority of Act No. 14 approved February 5, 1935 [Acts 1935, p. 27], and Act No. 50 approved February 8, 1935 [Acts 1935, p. 118]. 2nd. An amount (approximately $6,700,000.00) which, when added to the sinking fund (approximately $1,857,000.00) heretofore created to pay the bonds issued by the *1178 state of Alabama, commonly known as the `old bonded debt' and as `carpet bag bonds' together with the interest on said sinking fund accrued on September 30, 1947, shall equal the principal of said bonds in the sum of $8,557,000.00, shall be and is hereby set aside, and together with said sinking fund and the interest thereon, shall be and is hereby constituted an irrevocable trust fund for the purpose of paying the principal of said bonds upon their maturity, said bonds being the class A renewal bonds, class C renewal bonds and funding renewal bonds. That both of the irrevocable trust funds herein created shall be invested in United States government securities by the treasurer of the state of Alabama with the approval of the governor. 3rd. The residue shall be paid over to the building commission created by Act 128 of 1945 General Acts [p. 116] to be expended by said building commission for capital outlay only for educational purposes, provided, however, that not more than twelve per centum of such amount shall be allocated to the institutions of higher learning including the state teachers colleges, and not less than eighty-eight per centum shall be allocated to county and city boards of education on an actual teacher unit basis in accordance with the minimum school program.
"Section B. Beginning October 1, 1947, and thereafter, all net proceeds of such tax, plus the earnings from investment of the trust funds, must be used only in the manner and in the order following: (1) To replace the revenue lost to the several funds of the state by reason of the exemption of homesteads from the state ad valorem tax. All homesteads in Alabama are hereby declared to be exempt from all state ad valorem tax to the extent of at least $2,000.00 in assessed value and a sufficient amount is hereby appropriated from the proceeds of the income tax in each fiscal year to replace the revenue lost to the several funds of the state by reason of the homestead exemption herein declared; (2) The residue shall be placed in the state treasury to the credit of the Alabama special education trust fund to be used for the payment of public school teachers salaries only.
"Section C. This amendment supersedes the provisions of amendment XXV [25] (article XXII) relating to the disposition of the income tax proceeds insofar as the same are in conflict herewith. All laws relating to the income tax, not in conflict herewith and valid on the date of the ratification of this amendment, are hereby validated and confirmed. The provisions hereof with respect to the creation of funds and the use thereof are declared to be self-executing."
(Emphasis added.)
Because we disagree with certain portions of the trial court's reasoning, it would be helpful at this point to restate that section of the trial court's order that was adopted by the Court of Civil Appeals:
"Amendment 25's prohibition against the special income tax treatment of the income of public employees was repealed by the ratification of Amendment 61. After the ratification of Amendment 25 in 1933, the Legislature exempted the retirement benefits of Alabama school teachers and state employees, in 1939 and 1945 respectively, from all state taxation, including Alabama's income tax. In 1947, Amendment 61 was ratified. Amendment 61 superseded the provisions of Amendment 25 and repealed Amendment 25's prohibition against the special income tax treatment of the income of public employees by validating and confirming all `laws relating to, the income tax' which were valid on the date of the ratification of Amendment 61.
"Included in the existing `laws relating to the income tax' in 1947 were the exemptions from state tax granted by the Legislature to the retirement benefits of Alabama school teachers and state *1179 employees. Acts of Alabama 1939, No. 419, p. 559, at 573; Acts of Alabama 1945, No. 515, p. 734, at 748. At the time of the ratification of Amendment 61 in 1947, these exemption statutes were unchallenged, valid and presumed to be constitutional. Tanner v. Tuscaloosa County Commission, 594 So.2d 1207, at 1209 (Ala.1992); Craig v. State, 410 So.2d 449, at 453 (Ala.Crim.App.1981).
"The Legislature is presumed to have had full knowledge and information on those existing exemption statutes when Amendment 61 was proposed and ratified. See Ex parte Love, 513 So.2d 24, at 29 (Ala.1987) (citing Miller v. State, 349 So.2d 129 (Ala.Crim.App.1977)). Obviously, the Legislature intended to validate those exemptions and repeal the 25th Amendment's prohibition against the special income tax treatment of the income of public employees. Why else would Alabama's classification of retirement benefits remain unchallenged pursuant to the provisions of Amendment 25 for 50 years? There is no other explanation for the inclusion of the `validation' sentence in Amendment 61. The Legislature knew that an amendment to the Alabama Constitution repeals all inconsistent older provisions of the Constitution to the extent of any inconsistency. Birmingham Electric Co. v. Harry, 21 Ala.App. 483, 484, 111 So. 39, 40 (1926).
"Alabama's pre-1991 and post-1991 classification of retirement benefits, including the exemptions granted to the benefits of teachers and state employees and the subsequent partial exemptions granted to the benefits of peace officers and firefighters, cannot be interpreted to violate Amendment 25's prohibition against special income tax treatment of the income of public employees, because Amendment 61 repealed the prohibition of Amendment 25."
735 So.2d at 1169-70.
We do not agree that Amendment 61's repeal of Amendment 25 was all-encompassing. Both Amendment 25 and Amendment 61 contain sections detailing how the collected funds are to be spent. The portion of Amendment 61 that overrides Amendment 25 is clear: that portion "relating to the disposition of the income tax proceeds." Amendment 61 merely changes how the proceeds will be disposed of; the prohibition on special taxation treatment is left undisturbed.
Also, the Legislature can, as mentioned in the trial court's order, validate an unconstitutional statute. Ex parte Southern Ry., 556 So.2d 1082 (Ala.1989). However, the trial court's order seems to incorrectly imply that validation of certain exemptions to the prohibition of Amendment 25 repeals the prohibition in full. Logically, however, the prohibition would stand, but the exemptions would be immunized from further constitutional attack.
Although we note those disagreements for clarification purposes, we affirm the conclusion of the Court of Civil Appeals for a different reason. Decisions of this Court have made it clear that "[i]t is the duty of courts to sustain the constitutionality of a legislative act unless it is clear beyond a reasonable doubt that it is in violation of the fundamental law." Crosslin v. City of Muscle Shoals, 436 So.2d 862, 863 (Ala. 1983). See also White v. Reynolds Metals Co., 558 So.2d 373, 383 (Ala.1989); Home Indemnity Co. v. Anders, 459 So.2d 836, 840 (Ala.1984); State Board of Health v. Greater Birmingham Ass'n of Home Builders, Inc., 384 So.2d 1058, 1061 (Ala. 1980); Alabama State Federation of Labor v. McAdory, 246 Ala. 1, 9-10, 18 So.2d 810, 814-15 (1944); Yeilding v. State ex rel. Wilkinson, 232 Ala. 292, 298, 167 So. 580, 585 (1936) ("our solemn duty [is] to uphold a law, which has received the sanction of the Legislature, unless we are convinced beyond a reasonable doubt of its unconstitutionality"); State ex rel. Woodward v. Green, 154 Ala. 249, 254, 46 So. 268, 270 (1908). Therefore, only if the petitioners have demonstrated beyond a reasonable doubt that their interpretation of Amendment 25 is accurate would we declare the *1180 retirement-tax structure unconstitutional. Because we find, from the State's arguments, legitimate reasons to doubt the representatives' construction of Amendment 25's prohibition, we decline to strike down the retirement-tax structure at issue.
The State points out that Amendment 25, by its express terms, prohibits different income-tax treatment between public and private employees, not former employees. The State claims that, while the term "other compensation" may be broad, the "plain meanings" of the terms used by Amendment 25 limit the term "other compensation" to compensation of "employees." According to the State, the drafters of Amendment 25 could not have meant to incorporate the Davis notion of "deferred compensation," because retirement plans such as those before us were not even in existence in 1933, when Amendment 25 was drafted and ratified.[1] Of course, the representatives could argue that the inclusion of such broad language as "other compensation" was for the purpose of encompassing any future "employee compensation" like "deferred compensation." The language of Amendment 25, however, lends itself to both interpretations.
While we disagree with the State's contention that Amendment 61 expressly repealed the prohibition of Amendment 25, there may be merit to the State's further contention that Amendment 61 validated the exemptions that were in existence at that time. As mentioned above, the Legislature does have the ability to begin the process for validating a constitutionally deficient statute, by proposing a constitutional amendment that "by clear and express terms validates and confirms the statute." Ex parte Southern Ry., 556 So.2d 1082, 1090 (Ala.1989) (citing Bonds v. State Dep't of Revenue, 254 Ala. 553, 49 So.2d 280 (1950)). Amendment 61 expressly states that "[a]ll laws relating to the income tax, not in conflict herewith and valid on the date of the ratification of this amendment, are hereby validated and confirmed." The exemptions at issue would certainly be laws that relate to the income tax. It is not necessary, at this time, to decide whether the term "clear and express" refers to actually naming the statute in the validating amendment or to using the term "validate and confirm." However, the fact that the answer to that question is not immediately evident from the language of the Southern Ry. opinion suggests a reason to doubt the unconstitutionality of the retirement-tax structure, some of which has gone unchallenged for 50 years.
Because both sides proffer arguments that seem to take account of the textual and historical standpoints that this case involves, we are unable to say that, beyond a reasonable doubt, Alabama's system of exemptions violates Amendment 25. Therefore, we hold that the representatives have not met their burden; their argument based on Amendment 25 has not shown the summary judgment to be improper.

Issue II

Whether Alabama's retirement-tax structure violates the representatives' right to equal protection under the Fourteenth Amendment to the United States Constitution.
The representatives claim that Alabama's system of retirement-benefit exemptions for public employees violates the Equal Protection Clause of the Fourteenth Amendment. With regard to the standard we apply when reviewing legislative enactments for such federal equal-protection violations, this Court has stated:

*1181 "In equal protection jurisprudence, any law that does not employ a classification based on race, sex, national origin, or legitimacy of birth and does not impinge upon a fundamental right, is subject to the `rational relationship' analysis. Under this analysis, any law rationally related to a legitimate governmental objective will withstand an equal protection challenge."
Ex parte Robertson, 621 So.2d 1289, 1291 (Ala.1993). Stated another way, the "rational-relationship" analysis acknowledges the right of the State, in circumstances not involving a fundamental right or suspect classification, to utilize its plenary power to make some laws applicable to some of its citizens and not to others:
"The Equal Protection Clause does not deny the State the power to treat different classes of people in different ways. However, `[t]he classification must not be unrelated to the objective of the statute and "must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike."'"
Krupp Oil Co. v. Yeargan, 665 So.2d 920, 926 (Ala.1995) (quoting Tyson v. Johns-Manville Sales Corp., 399 So.2d 263, 271-72 (Ala.1981)).
Alabama's retirement-tax structure treats individuals differently, based on their status as either public employees or private employees. Because no fundamental right or suspect classification is involved, a challenge to this system fails to trigger either strict or intermediate scrutiny under current equal-protection jurisprudence. Therefore, to uphold its retirement-tax structure against a challenge under the Fourteenth Amendment, the State need only show that that structure is rationally related to a legitimate governmental objective.
With respect to this issue, we conclude that the Court of Civil Appeals properly applied the "rational-relationship" test described above to all four subclasses. We adopt that court's reasoning as stated in the "Equal Protection" section of its opinion in Melof v. James, 735 So.2d at 1170.

Issue III

Whether Alabama's retirement-tax structure violates the representatives' right to equal protection under the Alabama Constitution of 1901.
The representatives claim that the retirement-tax structure also violates an "equal-protection provision" they say is made up of §§ 1, 6, and 22 of the Alabama Constitution of 1901. Because we hold that Alabama has no such "equal-protection provision," we conclude that the court, in entering the summary judgment, was not denying equal protection guaranteed by the Alabama Constitution.
In declaring the existence of an "equal-protection provision" in the Alabama Constitution of 1901, this Court in 1977 unfortunately leapt upon a violently egregious editorial error made by an unofficial annotator and built on such an unworthy foundation a theory of constitutional law (equal protection) that absolutely requires solid support. To demonstrate not only how this happened, but the need now to correct that error, we give the following history of the 1901 "equal-protection provision" that never was.
In 1901, the State of Alabama held a Constitutional Convention in Montgomery. The delegates to the Convention specifically discussed and rejected the idea of incorporating into the 1901 Constitution the "equal-protection provision" that existed in Alabama's 1875 Constitution.
What appears as § 1 of the Constitution of 1901 first appeared in the Constitution of 1875, as Art. I, § 1; it was followed by § 2, which provided, in pertinent part:
"That all persons resident in this state... are hereby declared citizens of the State of Alabama, possessing equal civil and political rights."
*1182 What was Art. I, § 2, in the Constitution of 1875 had first become a part of an Alabama Constitution with the Constitution of 1868. The first two sections of the 1868 Constitution (Art. I, §§ 1, 2) provided:
"1. That all men are created equal; that they are endowed by their Creator with certain inalienable rights; that among these are life, liberty, and the pursuit of happiness.
"2. That all persons resident in this state, born in the United States, or naturalized, or who shall have legally declared their intention to become citizens of the United States, are hereby declared citizens of the State of Alabama, possessing equal civil and political rights and public privileges."
In the Constitution of 1875, the phrase "That all men are created equal" (from the 1868 Constitution) was deleted from Art. I, § 1, and the phrase "That all men are equally free and independent" was substituted therefor. The remainder of Art. I, § 1, was unchanged. All of § 2 was carried over from the 1868 Constitution into the Constitution of 1875 except the last three words, "and public privileges."
Therefore, it is evident that the drafters of the Constitution of 1868, which was drafted by a Constitutional Convention but was then defeated by the Alabama electorate, and "ratified" by the Congress of the United States before the ratification of the 14th Amendment, felt that, to provide for equal protection, something more was needed than the phrases "all men are created equal; ... they are endowed by their Creator with certain inalienable rights; [and] ... among these are life, liberty, and the pursuit of happiness." This is evident because these phrases, appearing in § 1, were followed by § 2, which provided that all citizens of Alabama "possess[ed] equal civil and political rights and public privileges."
It is also evident that the drafters of the Constitution of 1875 felt that, to provide for equal protection, something more was needed than the phrases "all men are equally free and independent; ... they are endowed by their Creator with certain inalienable rights; [and] ... among these are life, liberty, and the pursuit of happiness." This is evident because these phrases were followed by § 2, which provided that all citizens of Alabama "possess[ed] equal civil and political rights."
The provisions of Art. I, § 2, of the Constitution of 1875 were intentionally deleted from the Constitution of 1901, with the understanding that everything in that § 2 was "covered already by the Fourteenth Amendment [to the United States Constitution] and we [the members of the 1901 Constitutional Convention] could not change or alter it if we undertook to do so." Official Proceedings of the Constitutional Convention of 1901, p. 1640.
The minutes of the Constitutional Convention of 1901 show that after a motion was made to adopt what was Art. I, § 2, of the Constitution of 1875, as a section of the 1901 Constitution, there was a motion to amend the section. Official Proceedings of the Constitutional Convention of 1901, pp. 1622-23. After lengthy discussion (pp. 1623-28), there was a motion "to lay the section on the table" (p. 1628). This was discussed (pp. 1628-34); and on the 37th day, the Convention was adjourned without action being taken on any of the motions (p. 1634).
On the 38th day of the Convention, the motion to adopt § 2 of the 1875 Constitution and the proposed amendments to it were tabled upon a vote of 49 ayes and 42 noes (p. 1642). Before this happened, Mr. Lomax, who the preceding day had moved for the adoption of § 2, stated: "We [the Committee on the Preamble and Declaration of Rights, p. 1622] do not desire to get up a heated discussion about the meaning of words in the Declaration of Rights. We believe that everything in that particular section of the bill of rights [§ 2, above] is covered already by the Fourteenth Amendment [to the United States Constitution] *1183 and we could not change or alter it if we undertook to do so" (p. 1640).
The Committee on the Preamble and Declaration of Rights accepted two proposed amendments to § 2 and asked for unanimous consent, to which objection was made (p. 1640). Thereafter, the following transpired:
"MR. LOMAX: As the Convention refused to grant unanimous consent, I move that the section and the amendments be laid on the table.
"MR. PILLANS: Will the gentleman allow me to call his attention to one thing that may be material to be considered before that is done[?] Will he withdraw?
"MR. LOMAX: Yes.
"MR. PILLANS: It is simply this, the section as we find it in our last Code of this State, has appended to it a note, stating `the effect of this section is to place all persons natural and artificial on a basis of equality in the courts.' Citing the case of South and North Railroad against Morris, 65th, 75th, 85th, 87th and 106th Alabama, etc., and see also citations to another section: `there can be no discriminative advantage bestowed by law between the parties to the same suit,' citing other authorities. `The statute against miscegenation is not a denial of equal civil and political rights to the races.' Now if it appear from that, very likely that is a clause that has some efficacy and meaning, and has force in protecting investments and corporate rights and perhaps individual rights in this State, against hasty and ill advised legislation.
"MR. WALKER: Will the gentleman allow a suggestion?
"MR. PILLANS: Yes.
"MR. WALKER: Isn't that purpose completely effected by the provision of the Fourteenth Amendment to the Constitution of the United States?
"MR. PILLANS: It is, possibly. I only wanted to say that I expect to vote against laying the section on the table for the reason that it can be amended and preserved.
". . . .
"MR. LOMAX: In reply to the suggestion of the gentleman from Mobile, I will state that an investigation which I made last night demonstrated the fact that this provision is not contained in any Constitutions at all, in the language in which it appears in our Constitution. It appears substantially in the following Constitutions: New York, Connecticut, Indiana, Minnesota, South Carolina and Virginia, and does not appear in the Constitution of any other State, except those named, and, as I say, it does not appear in this language in those Constitutions. I have no doubt, however, that everything contained in that section is covered by the Fourteenth Amendment, as I said before, and we could not possibly alter it if we undertook to do so. I think the section ought to stand as it is written, and as it was adopted unanimously by the convention of 1875, or else it ought to go out altogether, and therefore I renew my motion to table both the amendments and the section.
". . . .
"MR. LOMAX: ... I now renew my motion to table."
Upon a vote being taken, a division was called for, and by a vote of 49 ayes to 42 noes the section and the amendments were laid upon the table.
On the 46th day of the Convention, on motion of Mr. Lomax, the chairman of the Committee on the Preamble and Declaration of Rights, the Preamble and the Declaration of Rights (from which Art. I, § 2, of the Constitution of 1875 had been deleted) were read a third time and were adopted by the Convention by a vote of 116 ayes and 2 noes (pp. 2254-60).
Thirty-eight years after the Convention, this Court decided the case of Pickett v. Matthews, 238 Ala. 542, 192 So. 261 (1939). Pickett involved a challenge to Alabama's *1184 then-existing "automobile guest statute." The specific facts of Pickett are not as important to the present case as is the understanding of the following language used by the Pickett Court:
"Sections 1, 6, 22, State Constitution; Amendment 14, Federal Constitution, U.S.C.A. ...:
"These taken together guarantee the equal protection of the laws, protect persons as to their inalienable rights; prohibit one from being deprived of his inalienable rights without due process; and prohibit irrevocable or exclusive grants of special privileges or immunities."
238 Ala. at 545, 192 So. at 264. Of course, the associative nature of this language could not be clearer. Four constitutional provisions are cited, and four corresponding constitutional doctrines are associated. Stated another way, each doctrine is, as demonstrated below, to be identified with a specific constitutional provision:
1. "... equal protection of the laws..."; guaranteed by "Amendment 14, [Section 1,] Federal Constitution":
"All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."
(Emphasis added.)
2. "... protect persons as to their inalienable rights ..."; guaranteed by "Section[] 1, ... State Constitution":
"[A]ll men are equally free and independent;... they are endowed by their Creator with certain inalienable rights;... among these are life, liberty and the pursuit of happiness."
(Emphasis added.)
3. "... prohibit one from being deprived of his inalienable rights without due process ..."; guaranteed by "Section[]... 6, ... State Constitution":
"That in all criminal prosecutions, the accused has a right to be heard by himself and counsel, or either; to demand the nature and cause of the accusation; and to have a copy thereof; to be confronted by the witnesses against him; to have compulsory process for obtaining witnesses in his favor; to testify in all cases, in his own behalf, if he elects so to do; and, in all prosecutions by indictment, a speedy, public trial, by an impartial jury of the county or district in which the offense was committed; and he shall not be compelled to give evidence against himself, nor be deprived of life, liberty, or property, except by due process of law; but the legislature may, by a general law, provide for a change of venue at the instance of the defendant in all prosecutions by indictment, and such change of venue, on application of the defendant, may be heard and determined without the personal presence of the defendant so applying therefor; provided, that at the time of the application for the change of venue, the defendant is imprisoned in jail or some legal place of confinement."
(Emphasis added.)
4. "... prohibit irrevocable or exclusive grants of special privileges or immunities"; guaranteed by "Section[] ... 22, State Constitution":
"That no ex post facto law, nor any law, impairing the obligations of contracts, or making any irrevocable or exclusive grants of special privileges or immunities, shall be passed by the legislature; and every grant or franchise, privilege, or immunity shall forever remain *1185 subject to revocation, alteration, or amendment."
(Emphasis added.)
The language structure used by the Pickett Court reflects the same understanding of equal protection that the delegates to the Constitutional Convention of 1901 had agreed upon: that any equal-protection guarantee in the State of Alabama would stem solely from the Fourteenth Amendment. This understanding is demonstrated more definitively from the paragraph that directly follows the language from Pickett quoted above:
"It is claimed that by those principles the legislature cannot legalize a negligent injury to one's person or property, thereby changing the rule of duty not to cause damage by a negligent act, whether that duty is a creature of the common law or statute. It is thought that to do so deprives one of `life, liberty, or property' without due process (section 6, Constitution), because such rights are inalienable under section 1, and create a special privilege under section 22, and violate the equal protection of the Fourteenth Amendment."
238 Ala. at 545, 192 So. at 264. (Emphasis added.) In fact, this understanding was apparently so clear that in 1949 the Justices of this Court issued an advisory opinion that stated:
"We point out that there is no equal protection clause in the Constitution of 1901. The equal protection clause of the Constitution of 1875 was dropped from the Constitution of 1901.Hamilton v. Adkins, 250 Ala. 557, 35 So.2d 183 [(1948)]; McLendon v. State, 179 Ala. 54, 58, 60 So. 392 [(1912)], Ann. Cas. 1915C, 691. Of course, the due process and equal protection clauses of the Fourteenth Amendment are involved [in the question presented]...."
Opinion of the Justices No. 102, 252 Ala. 527, 530, 41 So.2d 775, 777 (1949).
However, the seemingly unmistakable and historically consistent language of the Pickett decision was horribly confused by an erroneous unofficial annotation that appeared in the annotations to §§ 1 and 22 of the Constitution as printed in Ala.Code 1940 (Recompiled 1958), Vol. 1, pp. 26 and 89, and later in Ala.Code 1975, Vol. 1, pp. 79 and 168 (1977). The unofficial annotation misconstrued the Pickett language discussed above and summarized that portion of the decision as follows:
"Sections 1, 6 and 22 of the Constitution, taken together, guarantee the equal protection of the laws, protect persons as to their inalienable rights, prohibit one from being deprived of his inalienable rights without due process, and prohibit irrevocable or exclusive grants of special privileges or immunities."
Ala.Code 1940 (Recompiled 1958), Vol. 1, p. 26. (Emphasis added.) Of course, this is almost a direct quote from the Pickett opinion, but the annotation obviously and erroneously omits "Amendment 14, Federal Constitution," thereby transforming a simple and rather unexceptional list of obvious constitutional principles into a declaration of the birth of a grand constitutional doctrine.
Clearly, the annotation would have no authority unless adopted by this Court as a correct statement of the law, a contingency that unfortunately occurred in 1977 when the Court decided City of Hueytown v. Jiffy Chek Co., 342 So.2d 761 (Ala.1977). The City of Hueytown opinion used language that closely resembled that of the faulty annotation:
"Sections 1, 6, and 22 of the Alabama Constitution combine to guarantee equal protection of the laws."
342 So.2d at 762. The question whether the Court was actually relying on the unofficial annotation to declare the existence of an equal-protection provision in Alabama was answered later that same year in Peddy v. Montgomery, 345 So.2d 631 (Ala. 1977), when the Court practically quoted the annotation as if it were an accurate account of the language in Pickett:

*1186 "Any doubt about whether the Constitution of Alabama contained an equal protection provision was dispelled in Pickett v. Matthews, 238 Ala. 542, 192 So. 261 (1939), where it was held that §§ 1, 6 and 22 of Article 1 of the Constitution of 1901, taken together, guarantee the equal protection of the laws, and prohibit one from being deprived of his inalienable rights without due process."
345 So.2d at 633.
The fact that Alabama's so-called "equal-protection provision" sits upon a totally nonexistent foundation is evident. This lapse in judicial scholarship has been brought to the Court's attention repeatedly, see American Legion Post No. 57 v. Leahey, 681 So.2d 1337, 1347-48 (Ala.1996) (Houston, J., dissenting); Smith v. Schulte, 671 So.2d 1334, 1347-48 (Ala.1995) (Maddox, J., dissenting); Pinto v. Alabama Coalition for Equity, 662 So.2d 894, 901-10 (Ala.1995) (Houston, J., concurring in the result); Ex parte St. Vincent's Hosp., 652 So.2d 225, 230-31 (Ala.1994) (Houston, J., concurring specially); Moore v. Mobile Infirmary Ass'n, 592 So.2d 156, 174-78 (Ala.1991) (Houston, J., concurring in the result), and it is time that we recognized and corrected our error.
As to the role of the doctrine of stare decisis in this matter, we note that "`courts are not bound by stare decisis to follow a previous interpretation [that is] later found to be erroneous.'" Goodyear Tire & Rubber Co. v. J.M. Tull Metals Co., 629 So.2d 633, 638 (Ala.1993) (quoting 2B Norman J. Singer, Sutherland Statutory Construction, § 49.05, at 16 (5th ed.1992)). See also Ex parte Marek, 556 So.2d 375, 382 (Ala.1989) (noting that the doctrine of stare decisis does not render the courts helpless to correct their past errors). It would be difficult to imagine a more erroneous "interpretation" of Alabama constitutional law than to allow a wholly inaccurate unofficial annotation (which, by the way, has since been corrected by the Code publishers) to amend the Alabama Constitution.
Therefore, we now restate what the Justices of this Court correctly declared in 1949, that "there is no equal protection clause in the Constitution of 1901." Opinion of the Justices No. 102, supra, 252 Ala. at 530, 41 So.2d at 777. Under this rationale, then, the summary judgment was appropriate with respect to the representatives' claim that an equal-protection guarantee of the Alabama Constitution had been violated.
AFFIRMED.
HOOPER, C.J., and MADDOX, HOUSTON, SEE, and BROWN, JJ., concur specially.
KENNEDY and COOK, JJ., concur in the result and dissent from the rationale.
JOHNSTONE, J., dissents.
LYONS, J., recuses himself.
HOOPER, Chief Justice (concurring specially).
This was a difficult decision. I am persuaded by the main opinion that Alabama's Constitutional Convention of 1901 removed the explicit equal-protection clause that had been in our constitution. Yet, I am also persuaded by Justice Cook's special writing that the Alabama Constitution of 1901 contains an aspect of equal protection, no matter how hard the 1901 Convention tried to remove it.[2] I must concur with the main opinion, but I write to explain my understanding of this issue with respect to our present constitution.
"Equality before the law." Without that principle, can we say that we are a "government of laws and not of men?" If I appear before a court of law and my opponent *1187 receives more favorable treatment than I because of his race or his age or his social position or his wealth, can we say that we are equal before the law? The general principle of equal protection of the laws, otherwise termed as the concept that all men are equal before the law, is written into the very warp and woof of American law. It is a cornerstone of Western law itself.[3]
In that sense, I believe that without equality before the law, there can be no law at all. If, in fact, the law can change or disappear, depending upon the person appearing before a court of our State, then we really have no law at all. Without equality before the law, there is only the arbitrary decision of individual bureaucrats and judges. That is why I believe in the conservative approach to the law, the strict interpretation of statutes and our Constitution. Careful adherence to that doctrine of strict interpretation is the only way to avoid arbitrarily imposing upon the populace the whims and opinions of the individual judge himself. That is also why this Court attempts to follow precedent. Without a careful adherence to prior case-law dealing with an issue, there is no consistent application of the law. Without equal and consistent application of the law, we are not "equally free and independent."
That is why I was almost persuaded to join Justice Cook's special writing in this case. However, we must distinguish between that noble principle of "equality before the law," which I believe is implicit in all law, and the particular clause or clauses that the plaintiffs in this case argue are found within the four corners of this State's governing document, the Alabama Constitution of 1901. Finding no explicit equal-protection clause in the Alabama Constitution of 1901, and looking at the history behind the Constitutional Convention of 1901, I cannot say that there presently exists an equal-protection clause in our constitution. I can say that the courts of this State should apply the explicit protections of the 1901 Constitution, of which there are many,[4] evenly and without partiality. If there is a protection lacking, then the Fourteenth Amendment to the United States Constitution fills the gap.[5] Adhering to the doctrine of strict interpretation, I cannot agree that the Alabama Constitution of 1901 contains an equal-protection provision. At the same time, I can state an unequivocal belief that each person in this State that appears before our courts is equal before the law and is entitled to receive the same protections afforded by the law.
The main opinion is an intellectually honest one. I know that several other Justices share Justice Houston's personal desire to have an equal-protection clause in the Alabama Constitution. He has stated that desire clearly in his special writing. Sometimes we Justices must side with the law and the constitution as they are written, even if they conflict with our personal beliefs. It takes integrity for a judge to do that. I concur with the main opinion, and I find much to admire in the special writings of Justices Houston and See.
*1188 MADDOX, Justice (concurring specially).
I concur in the main opinion in this case and write specially only to state that my views on the question whether Alabama's Constitution of 1901 contains an "equal-protection" clause, a question some of the Justices have addressed in this case.
My views on this particular issue are stated in my dissenting opinion in Smith v. Schulte, 671 So.2d 1334, 1347 (Ala.1995) (Maddox, J., dissenting), where, although I stated that I agreed with Justice Houston that the Alabama Constitution did not contain an express equal-protection clause, I did note that "[t]he reasoned debate between the Justices of this Court on the question whether the Alabama Constitution has an `equal protection' clause would seem to be more academic than germane." The separate opinions of the Justices show that the debate on the issue continues.
As I have previously stated, although I recognize that the framers of the Constitution did not include an equal-protection clause in the 1901 Constitution, this Court, on several occasions, has held specifically that Alabama's Constitution, particularly §§ 1, 6, and 22, guarantee equal protection of the laws. I have concurred in some of those opinions. See Ex parte Jackson, 516 So.2d 768 (Ala.1986), and Ex parte Branch, 526 So.2d 609 (Ala.1987), which I wrote. Both of those cases state that §§ 1, 6, and 22, Ala. Const. of 1901, combine to guarantee equal protection of the laws. See also, Larry v. Taylor, 227 Ala. 90, 149 So. 104 (1933) (where a provision of a state statute was "challenged as arbitrary, discriminatory, and void because [it was] in contravention of the Fourteenth Amendment of the Federal Constitution and kindred sections of the Constitution of Alabama, such as sections 1, 6, and 22," 227 Ala. at 91, 149 So. at 105).
Except to note my views on the equal-protection issue that some of the Justices address in separate opinions, I concur completely with the main opinion.
HOUSTON, Justice (concurring specially).
"If I were drafting a constitution, I would make certain that there was an equal protection clause in that constitution; however, there is not one in the Alabama Constitution."
Moore v. Mobile Infirmary Ass'n, 592 So.2d 156, 175 (Ala.1991) (Houston, J., concurring in the result).
I first began to look into the issue whether the Alabama Constitution contained an equal-protection guarantee while the Court was dealing with the rash of cases challenging the constitutionality of the 1987 tort-reform legislation. The equal-protection challenges in those cases were based solely on the presumed existence of an Alabama equal-protection guarantee. From that time, I made it manifest that I believed in equal protection for Alabama's citizens and that I would certainly include an equal-protection clause if I were authoring a constitution for Alabama. However, the undeniable truth is that, as I stated in Moore in 1991, Alabama's Constitution has no equal-protection guarantee.
Among Supreme Court Justices, the notion of truth should be paramount. As demonstrated by Justice Cook's well-documented account of the racially biased forces that were present at the Constitutional Convention of 1901, we have all seen how much damage can be done by the State when truth is overlooked in favor of expedience and power. If I have done anything by consistently pointing out what is unfortunately but unmistakably true that Alabama's Constitution currently has no equal-protection clauseI have attempted to keep the Court from corrupting not only the Constitution, but itself as well. We pour corruption on both sacred entities by failing to resist the urge to drink from the chalice of illegitimate, but available, power. With that understood, I want to underscore one unavoidable truth: that the power to amend the Constitution *1189 rests with the people of the State of Alabama, not with the members of this Court.
Our commitment to truth demands that we understand our history so that we do not "attempt the Future's portal with the Past's blood-rusted key."[6] There was an opportunity, after Reconstruction, to remove the equal-protection clause that had existed in the 1868 Constitution. However, the Constitutional Convention of 1875 did not remove the clause. It was not until the Constitutional Convention of 1901 that a majority of the delegates voted to drop the equal-protection clause from the Alabama Constitution. What was not removed was the ability of the people to amend the Constitution to reflect their wishes.
We must recognize that we cannot change our history, no matter how egregious or embarrassing our history might be. It is precisely because individuals who govern can do some egregious things with the power that has been given them that we have the concept of the constitutiona legal document meant to achieve two primary goals. First, a constitution establishes a particular form of government. Second, a constitution, as the solidifying agent of the rights recognized by the government, protects the individual against the whim of those in power.
As a legal document, a constitution does not change on its own. The very purpose of protecting individuals would be undermined if those in charge of interpreting the constitution were to add or delete provisions to reflect "changes in society." Why? Because both the question of who selects the interpreter and the question of what counts as a "change in society" will be decided by those in power at any particular time. No, as a legal document, a constitution can change only if the parties who gave effect to the documentthe people call for change. This recognition of the exclusive right of the people to change their own constitution is inherent in the amendment procedure.
Of course, every constitution in our nation, state and federal, provides for such a procedure. We have seen numerous examples of how constitutions that included historically regrettable provisions were nonetheless remedied by amendment. The United States Constitution initially considered African-Americans as worth only three-fifths of a person for purposes of representation and taxation of the states. See U.S. Const. Art. 1, § 2. This embarrassing falsehood was corrected by § 2 of the Fourteenth Amendment. Because that same Constitution countenanced a situation in which women had no right to vote (again, because of fallacious assumptions), the Nineteenth Amendment was adopted. In these situations, the people exercised their right to correct wrongs in their Constitution. Related to their exercise of that right is the expectation of the people that we, as judges, will interpret our Constitutions and their amendments as they are written, in order to effectuate the will of the people. To go any further would be to usurp the powers of the people, and we should not do that simply because we can get away with it.
Such is the danger of sitting on the highest court of any sovereign when that court is interpreting the sovereign's own constitution. With no threat of being overruled, we can wield our words in any way that we like, knowing that they will be given the full effect of law. In this way, the nature of being Supreme Court Justices creates a dangerous dynamic. As we are sworn in, we are handedby the people a powerful sword: our ability to state what the law is. At the same time, we are placed inside a paper boundarya written constitutionand told by the people "this far you may go, and no further." The problem is that the sword can easily sever the boundary and we can escape its limits, perhaps with the notion of "doing justice." Once the boundary is severed, however, it *1190 is not easily repaired; and the next judge, now not bound, is free to do either justice or evil. As judges, then, we are entrusted by the people to use that sword wisely and with restraint; to stay within the boundary no matter how strongly we think it too small to meet the people's needs. The people made the boundary; it is for the people to enlarge it.
It is true, as Justice Cook points out, that racist motives were behind the action of the 1901 Constitutional Convention eliminating the equal-protection clause from our Constitution. The fact that we still do not have an equal-protection clause in our Constitution is certainly troubling. It is just this kind of situation that sparks in all of us such an emotional indignation that we want to correct this wrong as fast as possible, in any way possible. To be honest, had I walked in Justice Cook's shoes up to this point, it might be much harder for me to resist the urge to take the more expedient route and simply declare, in one way or the other, that Alabama does have an equal-protection provision. To be sure, a judicial declaration would be much faster and easier than a constitutional amendment. Also, I am sure that the general population would overwhelmingly support such a declaration. There would be very little resistance or grumbling among the citizens of Alabama, so why not?
The problem, of course, as I have illustrated above, is that while such a popular declaration may be all right today, we must ask: What about tomorrow's judge and tomorrow's issue? If we are not restrained to the text of the Constitution; if we current Justices can amend it today by judicial declaration to include a provision that the people have not put there, will the next "declaration" be so favorable? As Justice Cook has made clear in his dissent, those with power can do some horrible things for some horrible reasons. It is naive to think that something like that could not happen again. As the saying goes, those who do not pay attention to history are doomed to repeat it.
Might does not make right. We should not, simply because we can, shift the power to amend the Constitution from the hands of the people into the hands of nine Supreme Court Justices. I wholeheartedly believe that the Alabama Constitution should have an equal-protection clause, but I do not believe in obtaining it by a method that would turn this Court into an autonomous super-legislature. This idea has been no more eloquently stated than it was in Oakley v. Aspinwall, 3 N.Y. 547, 568 (1850). The following statement from Oakley was adopted by Justice Stone in Sadler v. Langham, 34 Ala. 311, 334 (1859), and was later quoted by me in the majority opinion in James v. Langford, 695 So.2d 1158, 1159 (Ala.1997):
"`It is highly probable that inconveniences will result from following the constitution as it is written. But that consideration can have no weight with me. It is not for us, but for those who made the instrument, to supply its defects. If the legislature or the courts may take that office on themselves, or if under color of construction, or upon any other specious ground, they may depart from that which is plainly declared, the people may well despair of ever being able to set a boundary to the powers of the government. Written constitutions will be more than useless.
"`Believing, as I do, that the success of free institutions depends on a rigid adherence to the fundamental law, I have never yielded to considerations of expediency in expounding it. There is always some plausible reason for the latitudinarian constructions which are resorted to for the purpose of acquiring powersome evil to be avoided, or some good to be attained, by pushing the powers of the government beyond their legitimate boundary. It is by yielding to such influences that constitutions are gradually undermined, and finally overthrown. My rule has ever been to follow *1191 the fundamental law as it is written, regardless of consequences. If the law does not work well, the people can amend it; and inconveniences can be borne long enough to await that process. But, if the legislature or the courts undertake to cure defects by forced and unnatural constructions, they inflict a wound upon the constitution which nothing can heal. One step taken by the legislature or the judiciary, in enlarging the powers of the government, opens the door for another, which will be sure to follow; and so the process goes on, until all respect for the fundamental law is lost, and the powers of the government are just what those in authority please to call them.'"
To show my eagerness to have an equal-protection clause in the Constitution of Alabama of 1901, I quote here a letter I have written to appropriate members of the legislative, executive, and judicial branches of our State government:
"I have seldom, if ever, asked you for assistance in getting legislation enacted. I believe too much in the very strong separation of powers provisions (§§ 43 and 44) in the Constitution of Alabama of 1901 to do that. However, I wholeheartedly believe that our Constitution should be amended by adding a section that was included in the Constitution of Alabama of 1868 and the Constitution of Alabama of 1875, but that was deleted from the 1901 Constitution by the Constitutional Convention of 1901. Canon 4 of the Canons of Judicial Ethics provides that a judge may engage in activities to improve the law. The addition of this section, which was part of our Constitution for 33 years, to our current Constitution, in my opinion, will improve the law in Alabama. This section provided as follows:
"`That all persons resident in this state, born in the United States, or naturalized, or who shall have legally declared their intention to become citizens of the United States, are hereby declared citizens of the State of Alabama, possessing equal civil and political rights.'
"The reason the drafters of the 1901 Constitution decided to delete this section from our Constitution as Alabama entered the 20th Century is a part of Alabama's history that cannot be changed. How this section was deleted is shown on pages 1622-42 of the Official Proceedings of the Constitutional Convention of 1901. However, I do think that this equal protection provision should be a part of the Alabama Constitution; we would be remiss if an equal protection provision were not a part of our Constitution, as we enter a new millennium.
"I am aware that there will be an election later this year to give Alabamians an opportunity to amend our Constitution. Therefore, if a bill proposing this amendment could be enacted, the amendment could be voted on in that election with little or no extra expense to the State. I believe that this amendment would be ratified overwhelmingly."
In response to Justice Johnstone's dissent, I adopt Justice Hugo L. Black's convincing analysis concerning the application of the doctrine of stare decisis to constitutional interpretation[7] that was recently referred to in Justice Lyons's special concurrence in Ex parte Dan Tucker Auto Sales, 718 So.2d 33 (Ala.1998). Justice Lyons wrote:
"Justice Hugo L. Black believed strongly that stare decisis had no role in matters of constitutional error. In defending the Supreme Court's duty to *1192 strike down even long-standing misconstructions of the Constitution, he stated:
"`That decision [striking down a century-old rule as unconstitutional] rested upon the sound principle that the rule of stare decisis cannot confer powers upon the courts which the inexorable command of the Constitution says they shall not have. State obedience to an unconstitutional assumption of power by the judicial branch of government, and inaction by the Congress, cannot amend the Constitution by creating and establishing a new "feature of our constitutional system." No provision of the Constitution authorizes its amendment in this manner.'
"Gwin, White & Prince, Inc. v. Henneford, 305 U.S. 434, 454-55, 59 S.Ct. 325, 83 L.Ed. 272 (1939) (Black, J., dissenting)."
718 So.2d at 42-43 n. 10 (Lyons, J., concurring specially).
SEE, Justice (concurring specially).
I write specially to address the plaintiffs' claim that Alabama's taxation of their retirement benefits violates a right to equal protection of the law under the Constitution of Alabama of 1901.
Prior decisions of this Court have recognized the possibility of an implied equal-protection guarantee in the Constitution of Alabama of 1901. In McLendon v. State, 179 Ala. 54, 60 So. 392 (1912), this Court addressed the question whether a statute that imposed an occupation tax on certain professions, but exempted Confederate veterans practicing those professions, violated, among others, §§ 1, 6, and 22 of the Constitution of Alabama of 1901,[8] and whether it violated the Fourteenth Amendment to the Constitution of the United States. 179 Ala. at 56-57, 60 So. at 392-93. This Court held that the statute violated the Fourteenth Amendment to the Constitution of the United States, but that it did not violate any of the provisions of the Declaration of Rights of the Constitution of Alabama of 1901, noting that Art. I, § 2, of the Constitution of Alabama of 1875,[9] which might have prohibited the exemption, had been dropped from the 1901 constitution. 179 Ala. at 58-59, 60 So. at 393. Despite the omission of former § 2, this Court recognized a general limitation on the power of the Legislature to engage in unreasonable discrimination in the imposition of taxes: "`Whilst there is no provision of the Constitution [of Alabama], commanding in terms equality and uniformity, the principle should underlie and regulate the provisions of every law imposing public burdens and charges.... The requirement is complied with, when the tax is levied equally and uniformly on all subjects of the same class and kind.'" McLendon, 179 Ala. at 57-58, 60 So. at 393 *1193 (quoting Western Union Tel. Co. v. State Board of Assessment, 80 Ala. 273, 280 (1885)). Later, in Bessemer Theatres v. City of Bessemer, 261 Ala. 632, 75 So.2d 651 (1954), a case involving a state-equal-protection challenge to a city ordinance that imposed a license tax on operators of motion picture theaters, this Court, citing McLendon, stated, "Reliance is had upon the equal protection clause and the due process clause of the Fourteenth Amendment to the Constitution of the United States as well as pertinent provisions of the Alabama Constitution, there being in the latter no equal protection clause except as implied in other sections." 261 Ala. at 635, 75 So.2d at 654. This Court held that the license tax did not violate either the Constitution of Alabama of 1901 or the Fourteenth Amendment to the Constitution of the United States. 261 Ala. at 639, 75 So.2d at 658.
Although this Court has stated in conclusory terms that §§ 1, 6, and 22 combine to guarantee equal protection of the laws,[10] and has, in fact, held legislation invalid on grounds that it violated the equal-protection guarantee of §§ 1, 6, and 22,[11] in none of those cases did this Court examine and interpret the language of those sections. Nor do those cases offer any rationale as to why, despite the differences between the language of the Fourteenth Amendment to the Constitution of the United States and the language of §§ 1, 6, and 22 of the Constitution of Alabama of 1901, the equal-protection analysis should be exactly the same.[12]
*1194 The plaintiffs argue, among other things, that subjecting their retirement benefits to state taxation violates the "equal protection provisions"Article I, §§ 1, 6, and 22of the Constitution of Alabama of 1901. The main opinion disposes of this claim by stating that the Constitution of Alabama of 1901 does not contain an equal-protection provision. Although the main opinion correctly states that there is no single, express equal-protection provision in the Constitution of Alabama of 1901,[13] I do not believe it follows that there can be no claim of denial of equal protection cognizable under the Constitution of Alabama. To accomplish the rule of law,[14] all provisions of the Constitution of Alabama of 1901 are attended by principles of equal protection of the law.[15] Any equal-protection claim, however, must be founded in the language of the constitution.[16] See Hornsby v. Sessions, 703 So.2d 932, 939 (Ala.1997) ("In searching for the proper construction of a constitutional provision, we must look to the language of that provision."); State ex rel. Fowler v. Stone, 237 Ala. 78, 83, 185 So. 404, 407-08 (1938) ("It is established as a rule of interpretation of constitutions that the whole of such instrument or ordinance will be given effect, if possible; that is, that each section, clause and word thereof be given effect...."). Thus, it was incumbent on the plaintiffs to demonstrate that subjecting their retirement benefits to state income taxation violated the language of § 1, 6, or 22, read separately or collectively.[17] See Gorman v. Wood, 663 So.2d 921, 922 *1195 (Ala.1995) (per curiam) (holding that an affirmance is justified where the appellant fails to demonstrate how cited authority applies to his argument); Hollis v. Warehouse Groceries Management, Inc., 481 So.2d 374, 375 (Ala.1985) (holding that the appellant's claims did not merit this Court's consideration because he did not sufficiently argue them in his brief); see also Alabama Power Co. v. Turner, 575 So.2d 551, 553 (Ala.1991), cert. denied, 500 U.S. 953, 111 S.Ct. 2260, 114 L.Ed.2d 713 (1991) ("[I]n order to challenge the constitutionality of a statute, an appellant must identify and make specific arguments regarding what specific rights it claims have been violated."). The plaintiffs did not present any such contextual analysis.[18]
The main opinion adequately addresses the federal equal-protection claim. Thus, because the plaintiffs present no argument founded in the language of §§ 1, 6, and 22 that the equal-protection guarantees of the Constitution of Alabama of 1901 are implicated, I must concur in affirming the judgment of the Court of Civil Appeals.
BROWN, J., concurs.
COOK, Justice (concurring in the result; dissenting from the rationale).
"`Equality of right is the first principle of American jurisprudence.'" McLendon v. State, 179 Ala. 54, 76, 60 So. 392, 399 (1912) (Mayfield J., dissenting) (emphasis in original). "The constitutional law knows no difference in the rights of citizens. Equal protection, under the law, is one of the corner stones of the American system *1196 of government, and experience admonishes us that these constitutional rights should be graven `with a pen of iron upon the rock forever.'" McGowan v. State, 184 Miss. 96, 106, 185 So. 826, 829 (1939).
Since 1991, Justice Houston has, in several cases, written that the Constitution of the State of Alabama does not contain an equal-protection guarantee. See American Legion Post No. 57 v. Leahey, 681 So.2d 1337, 1347-48 (Ala.1996) (Houston, J., dissenting); Smith v. Schulte, 671 So.2d 1334, 1348-52 (Ala.1995) (Houston, J., dissenting), cert. denied, 517 U.S. 1220, 116 S.Ct. 1849, 134 L.Ed.2d 950 (1996); Pinto v. Alabama Coalition for Equity, 662 So.2d 894, 901-10 (Ala.1995) (Houston, J., concurring in the result); Ex parte St. Vincent's Hospital, 652 So.2d 225, 230-31 (Ala.1994) (Houston, J., concurring specially); Moore v. Mobile Infirmary Ass'n, 592 So.2d 156 (Ala.1991) (Houston, J., disagreeing with the rationale of the main opinion, but concurring in the result). I can find no state supreme court opinion holdingas today's main opinion purports to dothat its state's constitution does not guarantee its citizens equal protection of the laws.[19] From that proposition, I dissent.
According to the main opinion, our Constitution does not guarantee equal protection, simply because it does not contain an express equal-protection "clause," such as was contained in Ala. Const. 1875, Art. I, § 2, which provided: "[A]ll persons resident in this State, born in the United States, or naturalized, or who shall have legally declared their intention to become citizens of the United States, are hereby declared citizens of the State of Alabama, possessing equal civil and political rights." (Emphasis added.[20]) From reading the main opinion, one might conclude that Alabama's Constitution is unique in *1197 this respect. On the contrary, it has been observed that "[m]ost state constitutions do not contain an `equal protection' clause," Robert F. Williams, Equality Guarantees in State Constitutional Law, 63 Tex. L.Rev. 1195, 1196 (1985) (emphasis added); and that "only nine states have true `equal protection' clauses." G. Alan Tarr, Constitutional Theory and State Constitutional Interpretation, 22 Rutgers L.J. 841, 859 (1991) (emphasis added).
"The clauses granting Equal Protection of the Law in various state constitutions come in many different forms." Jason W. Hayes, Amendment One: The Nebraska Equal Protection Clause, 32 Creighton L.Rev. 611, 618 (1998). Not surprisingly, a cursory reading of the various state constitutions reveals that they all share the pillars of American jurisprudence, expressed in similar, if not identical, language. Many of these provisions from which the guarantee of equal protection is said to emanate closely correspond to those provisions in the Alabama Constitution in which this Court has found an equal-protection guarantee, namely, Ala. Const.1901, §§ 1, 6, 13, 22, and 35. Those sections provide in pertinent part:
"[Sec. 1] That all men are equally free and independent; that they are endowed by their Creator with certain inalienable rights; that among these are life, liberty and the pursuit of happiness."
"[Sec. 6] That in all criminal prosecutions, the accused has a right to be heard by himself and counsel, or either,...; and, in all prosecutions by indictment, [to] a speedy, public trial, by an impartial jury ...; and he shall not be compelled to give evidence against himself, nor be deprived of life, liberty, or property, except by due process of law...."
"[Sec. 13] That all courts shall be open; and that every person, for any injury done him, in his lands, goods, person, or reputation, shall have a remedy by due process of law; and right and justice shall be administered without sale, denial, or delay."
"[Sec. 22] That no ex post facto law, nor any law, impairing the obligations of contracts, or making any irrevocable or exclusive grants of special privileges or immunities, shall be passed by the legislature; and every grant or franchise, privilege, or immunity shall forever remain subject to revocation, alteration, or amendment."
"[Sec. 35] That the sole object and only legitimate end of government is to protect the citizen in the enjoyment of life, liberty, and property, and when the government assumes other functions it is usurpation and oppression."
See, e.g., Ex parte Branch, 526 So.2d 609 (Ala.1987) (combination of §§ 1, 6, and 22 guarantees equal protection); Ex parte Jackson, 516 So.2d 768 (Ala.1986) (combination of §§ 1, 6, and 22 guarantees equal protection); Davis v. Everett, 443 So.2d 1232, 1236 (Ala.1983) (protection afforded by §§ 1, 6, and 22 "embraces at least the minimal requirements of the United States Constitution"); Robert Burton Associates, Ltd. v. Eagerton, 432 So.2d 1267 (Ala.1983) (sections 1 and 35 contain guarantee of equal protection); Fuller v. Associates Commercial Corp., 389 So.2d 506 (Ala. 1980) (sections 1, 13, 22, and 35 are "relevant" to a challenge based on equal protection); Mayo v. Rouselle Corp., 375 So.2d 449 (Ala.1979) (sections 1, 6, and 22 guarantee, or combine to guarantee, equal protection); Black v. Pike County Comm'n, 360 So.2d 303 (Ala.1978) (sections 1, 6, and 22 guarantee, or combine to guarantee, equal protection); City of Hueytown v. Jiffy Chek Co., 342 So.2d 761 (Ala.1977) *1198 (combination of §§ 1, 6, and 22 guarantees equal protection).
Compare these provisions with the following sections from the constitutions of New Hampshire, New Jersey, Pennsylvania, Vermont, and Wisconsin:
"[New Hampshire Const., part 1, art. 14] Every subject of this state is entitled to a certain remedy, by having recourse to the laws, for all injuries he may receive in his person, property, or character; to obtain right and justice freely, without being obliged to purchase it; completely, and without any denial; promptly, and without delay; conformably to the laws."
"[New Jersey Const.1947, art. 1, ¶ 1] All persons are by nature free and independent, and have certain natural and unalienable rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing, and protecting property, and of pursuing and obtaining safety and happiness."
"[Pa. Const., art. 1, § 1] All men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property and reputation, and of pursuing their own happiness."
"[Vt. Const. 1793, ch. 1, art. 7] That government is, or ought to be, instituted for the common benefit, protection, and security of the people, nation, or community, and not for the particular emolument or advantage of any single person, family, or set of persons, who are a part only of that community...."
"[Wis. Const. 1848, art. 1, § 1] All people are born equally free and independent, and have certain inherent rights; among these are life, liberty and the pursuit of happiness; to serve these rights, governments are instituted, deriving their just powers from the consent of the governed."
The similarities of these sections to certain of Alabama's "equal-protection provisions" cannot be denied. None of these sections contains an equal-protection "clause"; yet, all of them have been construed by the corresponding state courts as containing equal-protection guarantees. See, e.g., Opinion of the Justices, 137 N.H. 260, 628 A.2d 1069 (1993); State v. Basinow, 117 N.H. 176, 177, 371 A.2d 458, 459 (1977) (article 1 "is basically an equal protection clause in that it `"implies that all litigants similarly situated may appeal to the courts both for relief and for defense under like conditions and with like protection and without discrimination"'"); State v. Loftin, 157 N.J. 253, 724 A.2d 129 (1999); Sanchez v. Department of Human Servs., 314 N.J.Super. 11, 713 A.2d 1056 (App.Div.1998); Herrit v. Code Management Appeal Bd., 704 A.2d 186, 188 n. 6 (Pa.Commw.Ct.1997) (art. 1, § 1, "has been interpreted as affording property owners' rights comparable to the due process and equal protection rights under the 14th Amendment of the Federal Constitution"); Brigham v. State, 166 Vt. 246, 692 A.2d 384 (1997) ("common benefit" provision); Burlington Electric Dep't v. Vermont Dep't of Taxes, 154 Vt. 332, 576 A.2d 450 (1990); State v. Post, 197 Wis.2d 279, 318 n. 21, 541 N.W.2d 115, 128 n. 21 (1995), cert. denied, 521 U.S. 2507, 117 S.Ct. 1118, 138 L.Ed.2d 1011 (1997); State v. Heft, 185 Wis.2d 288, 517 N.W.2d 494 (1994).
Perhaps even more significantly, another group of courts has derived equal-protection guarantees directly from "due-process" provisions, such as:

*1199 "[Colo. Const., art. 2, § 25] No person shall be deprived of life, liberty or property, without due process of law."
"[Md. Const. 1867, Declaration of Rights, art. 24] That no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land."
"[Okla. Const. art. 2, § 7] No person shall be deprived of life, liberty, or property, without due process of law."
"[W. Va. Const., art. III, § 10] No person shall be deprived of life, liberty, or property, without due process of law, and the judgment of his peers."
Culver v. Ace Electric, 971 P.2d 641 (Colo. 1999); People v. District Court of 11th Judicial Dist., 964 P.2d 498 (Colo.1998); Murphy v. Edmonds, 325 Md. 342, 601 A.2d 102 (1992); State v. Good Samaritan Hosp., 299 Md. 310, 473 A.2d 892 (1984); Ross v. Peters, 846 P.2d 1107 (Okla.1993); Fair School Finance Council of Oklahoma, Inc. v. State, 746 P.2d 1135 n. 48 (Okla.1987); Israel v. West Virginia Secondary Schools Activities Comm'n, 182 W.Va. 454, 388 S.E.2d 480 (1989).
These sections and the cases construing them are especially significant, in view of the express due-process provisions in the Alabama Constitution. See § 13 ("every person, for any injury done him, in his lands, goods, person, or reputation, shall have a remedy by due process of law"). Correctly so, they stand on the principles of due process/equal protection as those principles have been declared by courts and commentators since Magna Carta.
Specifically, the phrase "due process of law" first appeared in the precise form now familiar to American jurisprudence in a statute enacted by Parliament in 1354. Lord Denning, The Due Process of Law v (1980). It provided: "That no Man of what Estate or Condition that he be, shall be put out of Land or Tenement, nor taken, nor imprisoned, nor disinherited, nor put to Death, without being brought in Answer by due Process of the Law." 28 Edw. III, c. 3 (1354). The emphasized phrase answered to the Latin "per legem terrae," that is, "by the laws of the land," which phrase appeared in Magna Carta, c. 39 (1215). See R. Thompson, An Historical Essay on the Magna Charta of King John 82-83 (Gryphon ed.1982).
That the phrase "due process of law" conveys the same meaning as the phrase "the law of the land" was explained by Sir Edward Coke, as follows:
"[Nisi per legem terrae.] But by the law of the land. For the true sense and exposition of these words, see the statute of 37 E. 3 cap. 8, where the [Latin] words, by the law of the land, are rendered [in Norman French] without due proces of law, for there it is said, [']though it be contained in the [G]reat [C]harter, that no man be taken imprisoned, or put out of his free-hold without proces of the law;['] that is, by indictment or presentment of good and lawfull men, where such deeds be done in due manner, or by writ originall of the common law."
1 E. Coke, The Second Part of the Institutes of the Laws of England 50 (W. Hein & Co. reprint 1986) (emphasis added).[21] *1200 "Law of the land" was the terminology most frequently used in American state constitutions before the ratification of the Constitution of the United States. Den v. Hoboken Land & Improvement Co., 18 How. (59 U.S.) 272, 276, 15 L.Ed. 372 (1856).
Alabama's earliest constitutions adopted the phrase "due course of law." Ala. Const. 1819, Art. I, §§ 10 and 14 (emphasis added); Ala. Const. 1861, Art. I, §§ 10 and 14 (emphasis added); Ala. Const. 1865, Art. I, §§ 7 and 14. The constitutions adopted since 1865 have used the phrase "due process of law." Ala. Const. 1868, Art. I, §§ 8 and 15; Ala. Const. 1875, Art. I, §§ 7 and 14; Ala. Const.1901, §§ 6 and 13.
Like the corresponding sections in former Alabama constitutions, § 6 of the present Constitution devolves directly from chapter 39 of Magna Carta, Dorman v. State, 34 Ala. 216, 236 (1859), overruling on other grounds recognized by Southern Express Co. v. Whittle, 194 Ala. 406, 69 So. 652 (1915), and, like the authorities cited above, Alabama courts have traditionally understood "due process of law" to be synonymous with "the law of the land." Opinion of the Justices No. 338, 624 So.2d 107, 161 (Ala.1993) ("due process provision `secures every citizen against arbitrary action of those in authority and places him (or her) within the protection of the law of the land'"; quoting McCollum v. Birmingham Post Co., 259 Ala. 88, 95, 65 So.2d 689, 695 (1953)); City of Dothan v. Holloway, 501 So.2d 1136, 1170 (Ala.1986) (the two phrases are "`synonymous'") (Beatty, J., dissenting); City of Birmingham v. Community Fire District, 336 So.2d 502, 505 (Ala.1976) (the two phrases are "`equivalent'"); Dorman, supra (the two phrases "are substantially identical"); Woodham v. State, 28 Ala.App. 62, 64, 178 So. 464, 465 (1938) (the two phrases are "synonymous"); State v. Bush, 12 Ala.App. 309, 312, 68 So. 492, 493 (1915) (phrases are "equivalent"). The relevance of this comparison lies in the fact that the phrase "law of the land" illustrates more clearly than the phrase "due process" the species of guarantees provided in Ala. Const.1901, §§ 6 and 13.
This is so, because "`[b]y the law of the land is most clearly intended the general law.... The meaning is, that every citizen shall hold his life, liberty, property, and immunities under the protection of the general rules which govern society.'" Zeigler v. South & North Ala. R.R., 58 Ala. 594, 597-98 (1877) (emphasis added) (quoting Daniel Webster's argument in Trustees of Dartmouth College v. Woodward, 4 Wheat. (17 U.S.) 518, 581-82, 4 L.Ed. 629 (1819)). "By `law of the land' is meant a general and public law, operating equally on every individual in the community." (Emphasis added.) Bank of the State v. Cooper, 2 Yerger (10 Tenn.) 599, 605 (1831). In other words, "`a partial law, tending, directly or indirectly, to deprive a corporation or individual of rights to property, or to the equal benefits of the general and public laws of the land, is unconstitutional and void.'" Id. at 621 (emphasis added). This principle aims to ensure that "`[t]he rights of every individual... stand or fall by the same rule or law that governs every other member of the body politic or `land,' under similar circumstances.'" Id. (Emphasis in original.)[22]
*1201 That this principle contains all the essential elements of equal protection is immediately apparent. The goal of the equal-protection doctrine is to ensure that the government will "treat similarly situated individuals in a similar manner," J. Nowak, R. Rotunda, & J. Young, Constitutional Law § 10.7, at 329 (3d ed.1986) (emphasis added). Otherwise stated, "the equal protection of the laws is a pledge of the protection of equal laws." Yick Wo v. Hopkins, 118 U.S. 356, 369, 6 S.Ct. 1064, 30 L.Ed. 220 (1886) (emphasis added). Indeed, "there is clearly an element of equal protection in due process." A.E. Dick Howard, The Road from Runnymede 313 (1968) (emphasis added). Due process and equal-protection guarantees both prohibit "`class legislation arbitrarily discriminatory against some and favoring others in like circumstances.'" City of Birmingham v. Piggly Wiggly Alabama Distributing Co., 638 So.2d 759, 762 (Ala.1994) (quoting Opinion of the Justices No. 102, 252 Ala. 527, 41 So.2d 775 (1949)).
The two principles are not necessarily "`coterminous in their spheres of protection.'" Id. However, "equality of right is fundamental in both.'" Id. (Emphasis added.) In other words, "class legislation" violates the equal-protection guarantee because it "arbitrarily discriminat[es] against some and favor[s] others in like circumstances," id., and it violates the due-process guarantee because such legislation is not "the law of the land." Opinion of the Justices No. 338, supra.
In fact, no clearer exposition of these principles need be sought than is found in Barrington v. Barrington, 206 Ala. 192, 89 So. 512 (1921), where this Court stated:
"Due process of law guaranteed by the federal Constitution has been defined in terms of the equal protection of the laws, that is, as being secured by laws operating on all alike, and not subjecting the individual to the arbitrary exercise of the powers of government, unrestrained by the established principles of private right and distributive justice.... `In order that a statute may comply with the necessary requirements as to due process of law, it must not violate the limitations as to classification imposed by the constitutional inhibition as to the denial of the equal protection of the laws. Thus the test with respect to the requirement of due process of law seems to be that if the law under consideration operates equally upon all who come within the class to be affected, embracing all persons who are or may be in like situation and circumstances, and the designation of the class is reasonable, not unjust or capricious or arbitrary, but based upon a real distinction, the law does operate uniformly, and if, added to this, the law is enforced by usual and appropriate methods, the requirement as to "due process of law" is satisfied.'"
Id. at 193-94, 89 So. at 513 (emphasis added).
Indeed, it is difficult to imagine a case in which the guarantee of due process is satisfied, but the guarantee of equal protection offended. Thus, unless this Court is now also willing to declare that our Constitution does not guarantee due process, it must concede that the Constitution guarantees equal protection through its express due-process provisions, and, consequently, that today's opinion is in error.
Although I acknowledge that, unlike other provisions of the Constitution, the guarantee of equal protection confers no substantive rights and creates no substantive liberties, this does not diminish the significance of a holding that there is no equal-protection guarantee in the Alabama Constitution. The function of an equal-protection guarantee is to measure the validity of statutory classifications or discrimination. *1202 A consequence of the concept that Alabama's Constitution has no equal-protection guarantee is that Alabamians will rely on a less stringent equal-protection analysis than existed under the Alabama standard. Heretofore, this court has zealously defended its right to review legislation under standards otherand sometimes stricterthan those required by contemporary Fourteenth Amendment analysis. See Moore v. Mobile Infirmary Ass'n, 592 So.2d 156, 170 (Ala.1991) (plurality); Smith v. Schulte, 671 So.2d 1334, 1337-38 (Ala.1995) (plurality). It is not enough to say that the Fourteenth Amendment guarantees equal protection. Alabama citizens should not be relegated to reliance on the charter of another sovereign for such fundamental protection.
Equally as troubling as today's holding itself, however, is the main opinion's express reliance on discussions of the delegates to the Constitutional Convention of 1901. Because the main opinion has chosen to invoke the "intent" of the Convention by quoting selected portions of those proceedings, I take this opportunity to elucidate that intent more fully, that is, to expand on the theme and purpose of that Convention.
As a matter of public record, the Constitutional Convention of 1901 was convened to disfranchiseas far as the Constitution of the United States would permitall Alabama citizens of African descent. This fact was spread upon the record of the proceedings, beginning with the opening address of the president of the Convention, John B. Knox. I Official Proceedings of the Constitutional Convention of the State of Alabama May 21, 1901, to September 3rd, 1901 6-7 (1940) (hereinafter Official Proceedings). That address stated in part:
"Gentlemen of the Convention:
"I thank you for the high honor you have conferred in electing me to preside over the deliberations of this Convention....
"IMPORTANCE OF THE ISSUE
"In my judgment, the people of Alabama have been called upon to face no more important situation than now confronts us, unless it be when they, in 1861, stirred by the momentous issue of impending conflict between the North and the South, were forced to decide whether they would remain in or withdraw from the Union.
"Then, as now, the negro was the prominent factor in the issue.
"The Southern people, with this grave problem of the races to deal with, are face to face with a new epoch in Constitution-making, the difficulties of which are great, but which, if solved wisely, may bring rest and peace and happiness. If otherwise, it may leave us and our posterity continuously involved in race conflict, or what may be worse, subjected permanently to the baneful influences of the political conditions now prevailing in the State.
". . . .
"And what is it that we want to do? Why it is within the limits imposed by the Federal Constitution, to establish white supremacy in this State.

"This is our problem, and we should be permitted to deal with it, unobstructed by outside influences, with a sense of our responsibilities as citizens and our duty to posterity.
". . . .
"THE ATTITUDE OF THE SOUTHERN MAN TOWARDS THE NEGRO
"The Southern man knows the negro, and the negro knows him. The only conflict which has, or is ever likely to arise, springs from the effort of ill-advised friends in the North to confer upon him, without previous training or preparation, places of power and responsibility, for which he is wholly unfitted, either by capacity or experience.
". . . .

*1203 "WHITE SUPREMACY BY LAW
"But if we would have white supremacy, we must establish it by lawnot by force or fraud. If you teach your boy that it is right to buy a vote, it is an easy step for him to learn to use money to bribe or corrupt officials or trustees of any class. If you teach your boy that it is right to steal votes, it is an easy step for him to believe that it is right to steal whatever he may need or greatly desire. The results of such an influence will enter every branch of society, it will reach your bank cashiers, and affect positions of trust in every department; it will ultimately enter your courts, and affect the administrations of justice.
"I submit it to the intelligent judgment of this Convention that there is no higher duty resting upon us, as citizens, and as delegates, than that which requires us to embody in the fundamental law such provisions as will enable us to protect the sanctity of the ballot in every portion of the State.

"The justification for whatever manipulation of the ballot that has occurred in this State has been the menace of negro domination. ..."
Id. at 7-10 (emphasis added).
The delegates shared Knox's understanding of the Convention's purpose and mission. This understanding was often repeated in speeches throughout the proceedings. For example, on the 53d day, Delegate Emmett O'Neal, a member of the "Committee on Suffrage and Elections," I Official Proceedings, at 101, stated:
"Mr. President, the problem which the Fourteenth and Fifteenth amendments to the Federal Constitution forced on the States of the South was the most momentous ever submitted to a free people. In the language of one of her greatest sons, `it is a problem in solving which the South must stand alone, in dealing with such she must come closer than ambition or despair have driven her, and on the outcome of which her very existence depends. This problem is to carry within her body politic two separate and distinct races, and nearly equal in number. She must carry these races in peace, for discord means ruin. She must carry them separately, for assimilation means debastment [sic]. She must carry them in equal justice, for to do this she is pledged in honor and gratitude. She must carry them to the end, for in all human probability she will never be quit of either.'
"To solve this problem to remedy the existing evils of [a]n unrestricted and debauched suffrage, and to secure for ourselves and posterity the benefits of enlightened government and of pure and lasting freedom, was the paramount object of this Convention. That was the chief inducement by which the people's consent to our being here was obtained, and that was the charge and duty with which we were invested and which we would be recreant to our solemn trust did we not perform faithfully and efficiently. Mr. President, realizing these facts, and recognizing their weight, the Committee on Suffrage approached its task of ballot reform, with all its immense and grave responsibilities, with its certain consequences for good or ill plainly before them, knowing that the very life of the State depended on the wise and permanent solution of the problem."
III Official Proceedings, at 2771 (emphasis added). Likewise, on the 55th day of the Convention, Delegate Charles Ferguson stated:
"Now, like Flannigan of Texas, `Gentlemen, for what purpose are we here?' It is, as outlined in the enabling act of calling this Convention, to amend and revise the Constitution of the State of Alabama. They had to put it that way in order to make it constitutional under the Constitution of the State, but gentlemen, we know the purpose for which it was called. There is not a man upon this floor but what knows the great supreme *1204 purpose for which this Convention was called, and that it was to reform the suffrage of the State, and to reform it in such a way that the white people might remain supreme in the control of its affairs, and to prevent the possibility, even though at remote times, of negro domination in this State."
III Official Proceedings, at 2930 (emphasis added). Indeed, the purpose of the Constitutional Convention of 1901 is so well known and understood that it has been aptly nicknamed the "disfranchising convention." Malcolm McMillan, Constitutional Development in Alabama, 1798-1901: A Study in Politics, the Negro, and Sectionalism 232 (1978).
The problem confronting the Convention was how, within the strictures of the United States Constitution, to disfranchise as many persons of African descentand as few persons of non-African descentas possible. This fact was illustrated by the platform of the "Democratic State Convention in Montgomery in March, 1899," which "pledg[ed] all Democrats to support the [constitutional convention] movement." Id. at 254-55. The state-convention platform provided in pertinent part:
"`We are in favor of holding a constitutional convention for so regulating the right to vote as to perpetuate the rule of the white man in Alabama.

"`The constitutional convention shall regulate suffrage so as not to conflict with the Federal Constitution and for the best interest of the people and taxpayers of Alabama.
"`. . . .
"`We pledge ourselves not to deprive any white man in Alabama of the right to vote except for conviction for infamous crimes.
"`. . . .
"`We instruct all Democratic members of the convention to faithfully carry out instructions.'"
Id. at 255 n. 45 (quoting "Minutes of the State Democratic Convention, March 29, 1899") (emphasis added).
To this end, the work and recommendations of the Committee on Suffrage and Elections were deemed to "`tower[ ] above others.'" Id. at 267 (quoting the Mobile Register, June 2, 1901). It was the sense of the Committee on Suffrage and Elections in the Constitutional Convention that the Fourteenth and Fifteen Amendments did not present "an insuperable barrier to the disfranchisement of the negro." III Official Proceedings, at 2777. More specifically, after a discourse on the legislative history of these two amendments, Delegate O'Neal proposed (1) that the Fourteenth Amendment merely "establish[ed] the citizenship of free negroes, which had been denied in the Dred Scott case"; and (2) that the Fifteenth Amendment did "not confer the right of suffrage," which, instead, emanated "from the States." III Official Proceedings, at 2776-77 (emphasis added). Consequently, he concluded, the United States Constitution did not prohibit discrimination against African-Americans except on the basis of "race, color or previous servitude." Id. at 2777. Further, he said:
"I therefore assert that the State can impose any restriction it may see fit on suffrage which is not directed in hostility to the negro race, not imposed on account of his race, color or previous condition of servitude and will not when tested by enlightened judicial construction be disturbed. If we abridge or deny the negro the right to vote, we take this action not in hostility to him as a race, not on account of his color or previous condition of servitude, but because his exercise of suffrage without restriction make[s] it unsafe to the life of the State and detrimental to all the interests of the people among whom he resides."
Id. at 2778. These opinions, and many similar ones, reflected the view that the framers of the proposed constitution could, *1205 consistent with the United States Constitution, deny large numbers of Alabama citizens the right to participate in the political process.
Thus, when the Committee on the Preamble and Declaration of Rights proposed to write into the new constitution the provisions of Art. I, § 2, Ala. Const. 1875providing that all Alabama citizens should have "equal civil and political rights"the proposal evoked opposition. More specifically, Delegate Coleman stated: "It seems that Section 2 is rather in conflict with the provision of the Committee's report on Suffrage and Elections." II Official Proceedings, at 1623 (emphasis added). There followed considerable discussion as to, among other things, the meaning of the phrase "equal civil and political rights," and whether the right to vote was a "civil and political right." Id. at 1623-42. In opposition to including the provisions of § 2, Delegate Coleman argued: "Now when a question comes up that admits of so much debate, as to which there is such a contrariety of opinion [as] has arisen upon the subject of this question, it seems to me that the Convention ought not to adopt it." Id. at 1628.
As a logical matter, it made little sense for the delegates, who were intent on disfranchising African-American citizens, and who believed their proposals would successfully circumvent the Fourteenth and Fifteenth Amendments, to include a provision in the state constitution that might be construed by the courts as guaranteeing the right to vote. In the final analysis, the proposal to include the provisions of § 2 failed.[23]
It was a credit to this Court that itlike the courts of Colorado, Maryland, New Hampshire, New Jersey, Oklahoma, Pennsylvania, Vermont, West Virginia, and Wisconsinfound a guarantee of equal protection to be inherent in the due-process and other pillar provisions of its Constitution. The main opinion sounds a retreat from this court's long-standing solicitude to a process under the Alabama Constitution that assured to Alabama citizens a means by which to measure the validity of classifications created by state laws. This Court thus ushers in the new millennium, out of the mainstream of American constitutional thought and deficient in its application of the fundamental constitutional concept of equal protection of the laws.
For these reasons, I dissent from that portion of the opinion purporting to hold that the constitution of Alabama does not contain a guarantee of equal protection. I would hold that it does contain an equal-protection guarantee. However, because I would hold that the taxation scheme at issue in this case does not violate that guarantee, I concur in the result.
KENNEDY, J., concurs.
JOHNSTONE, Justice (dissenting).
I dissent from the position of the main opinion that the Alabama Constitution of 1901 does not guarantee our citizens equal protection of the laws. The guarantee of equal protection serves the purpose of prohibiting governmental action which arbitrarily discriminates among citizens. The main opinion declares, in effect, that the Constitution of 1901 allows governmental action which arbitrarily discriminates.
I adopt Justice Cook's splendid special writing in this case to the extent that it demonstrates the inclusion of the equal-protection guarantee in the Alabama Constitution of 1901. While a majority of the delegates to the Constitutional Convention of 1901 may have intended, to diverse degrees, and some did intend to extreme degrees, to disenfranchise black citizens, the particular actions of the Convention were inadequate to eliminate all of the textual bases for the guarantee of equal protection and thus were inadequate to eliminate the guarantee itself.
*1206 An additional source of the guarantee of equal protection in the Constitution of 1901 is the language guaranteeing "a government of laws and not of men" in Art. III, § 43. The paramount purpose of "a government of laws and not of men" is to protect citizens from arbitrary discrimination by government officials. Further yet, this purpose would be entirely frustrated if the men (and now women) in the legislature could make laws which, themselves, arbitrarily discriminate among citizens.
Justice Cook's special writing and the main opinion in the case now before us catalogue the prior decisions of this Court recognizing the guarantee of equal protection in the Constitution of 1901. This Court should not overrule this jurisprudence but should, instead, both recognize the textual inclusion of equal protection in the Constitution of 1901 and apply the doctrine of stare decisis.
The Constitution of 1901 contains so much textual support for the guarantee of equal protection, as demonstrated by most of the writings in this case, that the Alabama Supreme Court precedents recognizing the inclusion of this guarantee in the Constitution cannot be correctly condemned as judicial usurpation of the power to write the Constitution. The courts frequently must decide issues of constitutional law from debatable constitutional text. The courts do not concoct these issues to rewrite the Constitution. Rather, the courts must obey their constitutional and statutory mandate to accept properly filed cases and to decide the issues presented by the parties.
If a party invokes one or more provisions of the Constitution, the courts are not free to ignore the issue even if the provision or provisions be general, vague, ambiguous, oblique, or conflicting. Rather, the courts must make the best sense they can of the Constitution, according to established principles of constitutional construction. When the courts decide such a case, it becomes precedent on the issue so decided, even though the issue may have been so debatable as to generate the court case in the first place. The precedent provides guidance to later parties similarly situated and to later courts similarly addressed. The social and practical value of that guidance is the reason for the doctrine of stare decisis. The more often a precedent is followed, the more stature the doctrine of stare decisis accords it.
While the doctrine of stare decisis obviously is not absolute, conservative respect for the doctrine is as necessary to the citizens as the rule of law itself. Stare decisis should not be violated except to end some practical injustice being wreaked upon the citizens by an unjust precedent.
The importance of the doctrine is most pronounced in constitutional jurisprudence, which recognizes, interprets, and applies the most fundamental legal principles on which all people rely in conducting and planning their lives and their businesses. Among the myriad of topics of constitutional jurisprudence are taxes, contracts, currency, commerce, crime, punishment, property, eminent domain, full faith and credit, rights, privileges, immunities, civil actions, defenses, judgments, legislation, executive powers, police powers, military defense, court procedures, and so forth, on and on. A reverence for stare decisis means that people and businesses can expect consistency in the judicial decisions on these topics. An irreverence for stare decisis means that people and businesses cannot know what to expect on these topics from one court decision to the next.
Some members of this Court who would discount the doctrine of stare decisis on constitutional issues have begun citing language written by Justice Hugo L. Black in Gwin, White & Prince, Inc. v. Henneford, 305 U.S. 434, 454-55, 59 S.Ct. 325, 83 L.Ed. 272 (1939) (Black, J., dissenting), for the proposition that "Black believed strongly that stare decisis had no role in matters of constitutional error." See, e.g., the special concurrence in Ex parte Dan Tucker Auto Sales, Inc., 718 So.2d 33, 38 *1207 (Ala.1998), and the special concurrence by Justice Houston in the case now before the Court. Neither Justice Black's language nor the facts and issue of the case containing the language support the proposition that he discounted the importance of stare decisis in constitutional jurisprudence.
In Gwin, Justice Black was assailing a United States Supreme Court precedent "still less than a year old" declaring that certain state tax statutes violated the Commerce Clause of the United States Constitution. Gwin, 305 U.S. at 454, 59 S.Ct. 325. Justice Black believed the tax statutes were constitutional. He was attacking what he regarded as judicial usurpation of the powers of Congress under the Commerce Clause. Justice Black was not advocating the abrogation, elimination, or infringement of the Commerce Clause, much less the abrogation or elimination of the guarantee of equal protection or any other constitutional guarantee to persons, natural or corporate.
In Gwin, Justice Black cites the case of Erie R.R. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), as precedent for overruling judicial usurpation of constitutional rights or powers. The issue in Erie was "whether the oft-challenged doctrine of Swift v. Tyson [41 U.S. 1 (16 Pet.), 10 L.Ed. 865 (1842)] shall now be disapproved." Erie, 304 U.S. at 69, 58 S.Ct. 817. Swift, in turn, had established the doctrine that federal courts exercising diversity jurisdiction were not bound by the caselaw of the states on substantive issues. Erie, 304 U.S. at 71, 58 S.Ct. 817. The reason the Erie court overruled Swift was not only that the doctrine of the older case usurped the sovereignty of the states, Erie, 304 U.S. at 78-80, 58 S.Ct. 817, but also that "the doctrine rendered impossible equal protection of the law," Erie, 304 U.S. at 75, 58 S.Ct. 817 (emphasis added). Thus, in Gwin, supra, Justice Black was extolling Erie for overruling Swift and thereby restoring equal protection of the law.
In Gwin, supra, Justice Black advocates overruling decisions which usurp either Congressional powers or state sovereignty or which frustrate equal protection of the laws. His language goes no further. The Alabama precedents for the proposition that the Constitution of 1901 guarantees equal protection of the laws do not constitute a judicial usurpation of either legislative powers or state sovereignty and obviously do not frustrate the very guarantee they secure. Gwin does not suggest that Justice Black would overrule these precedents. I respectfully submit that he would roll over in his grave were he to learn his name and work had been used to discount the doctrine of stare decisis in this context.
In the case now before this Court, where is the practical mandate for violating the doctrine of stare decisis? Do our citizens need arbitrary discrimination? Obviously not. Do any of our governmental officials or entities want to discriminate arbitrarily? Hopefully and probably not. What practical injustice are the Alabama precedents that include equal protection in the Constitution of 1901 wreaking on our citizens? Justice Houston agrees that Alabama has needed an equal-protection guarantee in our Constitution for the last century, albeit by constitutional amendment. See Moore v. Mobile Infirmary Ass'n, 592 So.2d 156, 175 (Ala.1991) (Houston, J., concurring in the result), and the special concurrence of Houston, J., in the case now before the Court. We would hardly need something that has been wreaking practical injustice. Do the results of all the cases decided on the ground of an Alabama equal-protection clause need, in turn, to be overruled? Most, and probably all, members of this Court have publicly condemned agenda-based judicial philosophy.
No legitimate mandate exists to violate the doctrine of stare decisis as it applies to the precedents for the inclusion of equal protection in the Constitution of 1901. *1208 The absence of such a mandate seems palpable and should be controlling.
NOTES
[1] Many Southern states did not have retirement systems at the time of the ratification of Amendment 25 in 1933. See Ark.Code Ann. § 24-4-103 (derived from 1947 Ark. Acts § 12-2502); Fla. Stat. ch. 121 (derived from 1945 Fla. Laws, c. 22831 §§ 1 to 20); Ga. Code Ann. § 47-3-20 (derived from 1943 Ga. Laws, p. 640, § 2); Ky.Rev.Stat. Ann. § 161.230 (derived from (1942 Ky. Acts c. 208, § 1)); Miss.Code Ann. § 25-11-101 (derived from 1942 Miss.Code, § 7446-11); S.C.Code Ann. § 9-1-20 (derived from 1945 S.C.Code (44) 212).
[2] Section 1 of the Constitution of Alabama of 1901 reads:

"That all men are equally free and independent; that they are endowed by their Creator with certain inalienable rights; that among these are life, liberty and the pursuit of happiness."
[3] "Thou shalt do no unrighteousness in judgment: thou shalt not respect the person of the poor, nor honor the person of the mighty: but in righteousness shalt thou judge thy neighbour." Leviticus 19:15 (King James).

"Ye shall not respect persons in judgment; but ye shall hear the small as well as the great; ye shall not be afraid of the face of man; for the judgment is God's...." Deuteronomy 1:17 (King James).
"Ye shall have one manner of law, as well for the stranger [resident alien], as for one of your own country: for I am the Lord your God." Leviticus 24:22 (King James).
[4] The provisions of §§ 1, 6, and 22 are just three examples of the many rights and protections contained in the Alabama Constitution of 1901. We must apply those provisions, and the protections provided by statutes passed by the legislature, to all persons equally.
[5] See Pickett v. Matthews, 238 Ala. 542, 192 So. 261 (1939), for an example of applying §§ 1, 6, and 22 in conjunction with the Fourteenth Amendment.
[6] James Russell Lowell, "The Present Crisis."
[7] For some examples of the application of the doctrine of stare decisis to error not relating to constitutional interpretation, see Lowman v. Piedmont Executive Shirt Mfg. Co., 547 So.2d 90, 96 (Ala.1989) (Houston, J., concurring in part and dissenting in part), and Southern States Ford, Inc. v. Proctor, 541 So.2d 1081, 1092-93 (Ala.1989) (Houston, J., concurring specially).
[8] These sections provide:

"[§ 1] That all men are equally free and independent; that they are endowed by their Creator with certain inalienable rights; that among these are life, liberty and the pursuit of happiness."
"[§ 6] That in all criminal prosecutions, the accused ... shall not be compelled to give evidence against himself, nor be deprived of life, liberty, or property, except by due process of law...."
"[§ 22] That no ex post facto law, nor any law, impairing the obligations of contracts, or making any irrevocable or exclusive grants of special privileges or immunities, shall be passed by the legislature; and every grant or franchise, privilege, or immunity shall forever remain subject to revocation, alteration, or amendment."
In McLendon, this Court also considered §§ 29, 35, 211, and 217.
[9] That section had provided:

"That the great, general, and essential principles of liberty and free government may be recognized and established, we declare:
". . . .
"Sec. 2. That all persons resident in this state, born in the United States, or naturalized, or who shall have legally declared their intention to become citizens of the United States, are hereby declared citizens of the State of Alabama, possessing equal civil and political rights."
[10] See, e.g., Moore v. Mobile Infirmary Ass'n, 592 So.2d 156, 165 (Ala.1991) (plurality opinion) ("Sections 1, 6, and 22 of the Declaration of Rights combine to guarantee equal protection under the laws of Alabama."); Plitt v. Griggs, 585 So.2d 1317, 1325 (Ala.1991) ("Sections 1, 6, and 22 of Article I, Constitution of Alabama 1901, combine to guarantee the citizens of Alabama equal protection under the laws."); Mayo v. Rouselle Corp., 375 So.2d 449, 451, 452 (Ala.1979) (answering in the negative the certified question whether Ala.Code 1975, § 7-2-725, "violates §§ 1, 6 and 22 of the Alabama Constitution of 1901, which provide for equal protection of the law"); Black v. Pike County Comm'n, 360 So.2d 303, 306 (Ala.1978) ("Sections 1, 6 and 22 of the Alabama Constitution combine to guarantee equal protection of the laws."); Peddy v. Montgomery, 345 So.2d 631, 633 (Ala.1977) ("Any doubt about whether the Constitution of Alabama contained an equal protection provision was dispelled in Pickett v. Matthews, 238 Ala. 542, 192 So. 261 (1939), where it was held that §§ 1, 6 and 22 of Article 1 of the Constitution of 1901, taken together, guarantee the equal protection of the laws, and prohibit one from being deprived of his inalienable rights without due process."); City of Hueytown v. Jiffy Chek Co. of Alabama, 342 So.2d 761, 762 (Ala.1977) ("Sections 1, 6, and 22 of the Alabama Constitution combine to guarantee equal protection of the laws."). But see Pinto v. Alabama Coalition for Equity, 662 So.2d 894, 901, 904-10 (Houston, J., concurring in the result) (criticizing those cases); Moore v. Mobile Infirmary Ass'n, 592 So.2d 156, 171, 174 (Houston, J., concurring in the result) (same).
[11] See, e.g., Jolly v. Knopf, 463 So.2d 150, 153 (Ala.1985) ("We hold ... the statute [Ala. Code 1975, § 35-6-100] violates the equal protection provisions of the Constitution of this state, §§ 1, 6, and 22, ... as well as the Constitution of the United States, Amendment 14."); Harrison v. Buckhalt, 364 So.2d 283, 286 (Ala.1978) ("[W]e hold [the city liquor ordinance] discriminatory, arbitrary, unreasonable, and therefore a denial of equal protection of the laws guaranteed by Sections 1, 6 and 22 of the Constitution of Alabama of 1901."); see also Smith v. Schulte, 671 So.2d 1334, 1337 (Ala.1995), cert. denied, 517 U.S. 1220, 116 S.Ct. 1849, 134 L.Ed.2d 950 (1996) (stating, in reliance upon Moore v. Mobile Infirmary Ass'n, 592 So.2d 156 (Ala.1991), supra, note 3, that Ala.Code 1975, § 6-5-547, which limited to $1,000,000 the amount recoverable in a wrongful-death action against medical providers, violated the equal-protection guarantee of the Alabama Constitution) (plurality opinion).
[12] See, e.g., Plitt v. Griggs, 585 So.2d 1317, 1325 (Ala.1991) (holding that Ala.Code 1975, § 6-5-548(c), which establishes requirements for admission of an expert opinion against a health-care provider in a medical-malpractice action, does not violate §§ 1, 6, and 22 of the Alabama Constitution) ("However, [the plaintiff] states no reason, and we are aware of none, that our analysis of the equal protection issue under the United States Constitution should not be equally applicable to [the plaintiff's] equal protection issue regarding the Alabama Constitution; therefore, we consider the above analysis [under the Fourteenth Amendment to the United States Constitution] to apply equally to that issue."); Jefferson County v. Braswell, 407 So.2d 115, 122 (Ala. 1981) (holding that local law regulating retail beer sales in Jefferson County did not violate the equal-protection guarantee of the Alabama Constitution) ("We consider our analysis of the equal protection and due process issues under the United States Constitution equally applicable to those same issues under the Alabama Constitution.").
[13] The delegates to the Constitutional Convention of 1901 intentionally omitted from the Constitution of Alabama of 1901 the equal-protection provision of the Constitution of Alabama of 1875. See Opinion of the Justices No. 102, 252 Ala. 527, 530, 41 So.2d 775, 777 (1949) ("We point out that there is no equal protection clause in the Constitution of 1901. The equal protection clause of the Constitution of 1875 was dropped from the Constitution of 1901."); McLendon v. State, 179 Ala. 54, 58, 60 So. 392, 393 (1912) ("It is noteworthy that this section [Art. I, § 2, of the Constitution of Alabama of 1875] was dropped from the Constitution of 1901...."); 2 Official Proceedings of the Constitutional Convention of the State of Alabama of 1901, 1622-34, 1639-44, 2254-60 (1940); see also Pinto v. Alabama Coalition for Equity, 662 So.2d 894, 901, 904-10 (Ala.1995) (Houston, J., concurring in the result); Moore v. Mobile Infirmary Ass'n, 592 So.2d 156, 171, 174 (Ala.1991) (Houston, J., concurring in the result); cf. Ala. Const. 1875, art. I, § 2.
[14] Article III, § 43, of the Constitution of Alabama of 1901 expressly provides for the separation of powers, "to the end that it may be a government of laws and not of men."
[15] As Cicero stated:

"Wherefore, since the law is the bond of civil society, and the justice of the law equal, by what rule can the association of citizens be held together, if the condition of the citizens be not equal? For if the fortunes of men cannot be reduced to this equalityif genius cannot be equally the property of allrights, at least, should be equal, among those who are citizens of the same republic. For what is a republic, but an association of rights?"
Cicero, On the Commonwealth, XXXII, 397 (C.D. Yonge trans., Bohn's Classical Library 1887).
[16] As the Supreme Court of the United States has recognized:

"The Judiciary, including this Court, is the most vulnerable and comes nearest to illegitimacy when it deals with judge-made constitutional law having little or no cognizable roots in the language or even the design of the Constitution."
Michael H. v. Gerald D., 491 U.S. 110, 122, 109 S.Ct. 2333, 105 L.Ed.2d 91 (1989) (quoting Moore v. East Cleveland, 431 U.S. 494, 502, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977) (White, J., dissenting)).
[17] Because the plaintiffs do not claim that the taxation scheme violates any provisions other than §§ 1, 6, and 22, I do not address whether a guarantee of equal protection is embodied in other provisions of the Constitution of Alabama of 1901. Cf., e.g., Ala. Const.1901, art. I, § 13 ("every person, for any injury done him, in his lands, goods, person, or reputation, shall have a remedy by due process of law"); art. I, § 29 ("That no title of nobility or hereditary distinction, privilege, honor, or emolument shall ever be granted or conferred in this state; and that no office shall be created, the appointment to which shall be for a longer time than during good behavior."); art. I, § 35 ("That the sole object and only legitimate end of government is to protect the citizen in the enjoyment of life, liberty, and property, and when the government assumes other functions it is usurpation and oppression."); art. III, § 43 (separating the powers of government among three equal branches "to the end that it may be a government of laws and not of men"); art. IV, § 104, amended by Amends. No. 375 and No. 397 (prohibiting the legislature from passing any special, private, or local law, among other things, "exempting any individual, private corporation, or association from the operation of any general law"); art. XI, § 211 ("All taxes levied on property in this state shall be assessed in exact proportion to the value of such property ...."); art. XI, § 217 ("The property of private corporations, associations, and individuals of this state shall forever be taxed at the same rate ...."), amended by Amends. No. 325 and No. 373.
[18] The class plaintiffs ask this Court to apply the heightened level of scrutiny used in Moore v. Mobile Infirmary Ass'n, 592 So.2d 156, 165 (Ala.1991), where a plurality of this Court articulated a two-pronged test to determine whether legislation affecting a private or fundamental right violates the equal-protection guarantee of the Alabama Constitution. Under the Moore test, a reviewing court would determine: "[1][W]hether [the classification created under the statute is] reasonably related to the stated objective [of the statute], and... [2] whether the benefit sought to be bestowed upon society outweighs the detriment to private rights occasioned by the statute." 592 So.2d at 166.

Moore, however, did not involve an equal-protection challenge to a taxation statute. In fact, this Court, in addressing such challenges, has applied an analysis like the federal rational-basis test, rather than the test suggested in Moore. See Woco Pep Co. of Montgomery v. City of Montgomery, 213 Ala. 452, 457, 105 So. 214, 219 (1925); State v. Pure Oil Co., 256 Ala. 534, 538, 55 So.2d 843, 846 (1951); National Motor Fleets, Inc. v. Brown, 282 Ala. 572, 576-77, 213 So.2d 570, 573-74 (1968). Moreover, in taxation cases, equal-protection claims have been based on §§ 1 and 35, rather than on §§ 1, 6, and 22. See Robert Burton Associates, Ltd. v. Eagerton, 432 So.2d 1267, 1268 (Ala.1983) (holding statute that imposed a higher tax on gummed cigarette papers than on ungummed cigarette papers invalid because it "violate[d] the equal protection provisions of the Alabama Constitution, Article I, §§ 1 and 35"). In this case, the plaintiffs do not claim any violation of § 35, nor do they offer any analysis of the language of §§ 1, 6, and 22 justifying the application of the Moore test to this case. Even if this Court were to adopt the plurality opinion in Moore, the plaintiffs have failed to present the extensive analysis required by that test.
[19] Only in Delaware and Mississippi is there any question regarding the existence of state-guaranteed equal protection. In this connection, the Supreme Court of Delaware has stated:

"Article I, section 7, of the Delaware Constitution provides that no person shall be deprived of property except `by the law of the land.' We have previously held that the phrase `due process of law' as contained in the Federal Constitution and the phrase `law of the land' as used in our State Constitution have substantially the same meaning. In comparison, the Delaware Constitution contains no equal protection clause per se. We find it unnecessary, in this case, to determine whether the equal protection concept inures as a matter of due process under the Delaware Constitution. But see Attorney General of Md. v. Waldron, [289 Md. 683,] 426 A.2d 929, 940-41 (1981)."
Hughes v. State, 653 A.2d 241, 243 n. 3 (Del. 1994) (citation omitted).
In Mississippi, at least one Justice assumes that Miss. Const. art. 3, § 14, which provides that "No person shall be deprived of life, liberty, or property except by due process of law," guarantees equal protection. Secretary of State v. Wiesenberg, 633 So.2d 983, 998 (Miss.1994) (McRae, J., dissenting).
[20] The main opinion focuses on Pickett v. Matthews, 238 Ala. 542, 192 So. 261 (1939), and attempts to demonstrate that Pickett does not say what it says. 735 So.2d at 1184-85. Although the attempt is unpersuasive, it also misses the point. The point is that this Court has so often reaffirmed that principle throughout the years that the cases so holding are too numerous to cite. Therefore, it is too late in the day to suggest, as the main opinion does, that Alabama's equal-protection guarantee springs from an erroneous annotation regarding the holding of Pickett.

The main opinion also ignores the body of caselaw emanating from this Court from 1901 until Pickett, finding general principles of equality and uniformity inherent in various provisions of the Constitution. See, e.g., Woco Pep Co. of Montgomery v. City of Montgomery, 213 Ala. 452, 105 So. 214 (1925); Maury v. State, 208 Ala. 46, 93 So. 802 (1922); Birmingham-Tuscaloosa Ry. & Utilities Co. v. Carpenter, 194 Ala. 141, 69 So. 626 (1915); State ex rel. Brassell v. Teasley, 194 Ala. 574, 69 So. 723 (1915) (Mayfield, J., dissenting); McLendon v. State, 179 Ala. 54, 76, 60 So. 392, 399 (1912) (Mayfield J., dissenting); Alabama Consolidated Coal & Iron Co. v. Herzberg, 177 Ala. 248, 59 So. 305 (1912); Birmingham Waterworks Co. v. State, 159 Ala. 118, 48 So. 658 (1909) (relying on cases decided under Ala. Const. 1875); City Council of Montgomery v. Kelly, 142 Ala. 552, 38 So. 67 (1905), overruled on other grounds, Standard Chemical & Oil Co. v. City of Troy, 201 Ala. 89, 77 So. 383 (1917); Toney v. State, 141 Ala. 120, 37 So. 332 (1904).
[21] See also 1 E. Coke, at 50, marginal notes citing 25 Edw. III, c. 4 (135½), which provides:

"Whereas it is contained in the Great Charter of the Franchises of England, that none shall be imprisoned nor put out of his Freehold, nor of his Franchises nor free Custom, unless it be by the Law of the Land; It is accorded ... That from henceforth none shall be taken by Petition or Suggestion... unless it be by Indictment or Presentment of good and lawful People of the same neighborhood where such Deeds be done, in due Manner, or by Process made by Writ original at the Common Law; nor that none be out of his Franchises, nor of his Freeholds, unless he be duly brought in to answer, and forejudged of the same by the Course of the Law; and if anything be done against the same, it shall be redressed and holden for none."
25 Edw. III, c. 4 (emphasis added).
[22] In the words of Blackstone, a law "is a rule; not a transient sudden order from a superior to or concerning a particular person, but something permanent, uniform, and universal." I W. Blackstone, Commentaries on the Laws of England 44 (reprint 1979) (emphasis in original). "Therefore a particular act of the legislature to confiscate the goods of Titius ... does not enter into the idea of a... law: for the operation of this act is spent upon Titius only, and has no relation to the community in general; it is rather a sentence than a law." Id. (Emphasis added.)
[23] The first portion of § 2 was also inconsistent with immigration and residency requirements proposed by the Committee on Suffrage. II Official Proceedings, at 1623-42.